145 F.3d 551
 UNITED STATES of America, Appellant,
v.
Victor J. ORENA; Pasquale Amato; Carmine Sessa; Michael
Sessa; Lawrence A. Fiorenza; Lawrence Mazza; Robert
Zambardi; Alphonse Persico; Joseph Tomasello; Theodore
Persico, Sr.; Richard Fusco; James Delmastro, Defendants,
Joseph P. Russo; Anthony Russo; and Joseph Monteleone,
Sr., Defendants-Appellees.
 Docket Nos. 97-1174 to 97-1176.
 United States Court of Appeals,
Second Circuit.
 Argued March 6, 1998.
Decided June 3, 1998.
 
 Valerie Caproni, Assistant United States Attorney for the Eastern District of New York, Brooklyn, NY (Zachary W. Carter, United States Attorney for the Eastern District of New York, Barbara D. Underwood, Chief Assistant United States Attorney, of counsel), for Appellant United States of America.
 Salvatore J. Marinello, Mineola, NY, for Appellee Joseph P. Russo.
 Alan S. Futerfas, New York City (Ellen B. Resnick, of counsel), for Appellee Anthony Russo.
 Joshua L. Dratel, New York City (Marion A. Seltzer, of counsel), for Appellee Joseph Monteleone, Sr.
 Before: OAKES and CABRANES, Circuit Judges, and HURLEY, District Judge.*
 JOSE A. CABRANES, Circuit Judge:
 
 
 1
 The government appeals from that portion of a judgment of the United States District Court for the Eastern District of New York (Charles P. Sifton, Chief Judge ) granting a new trial to defendants-appellees Joseph P. Russo, Anthony Russo, and Joseph Monteleone, Sr. See United States v. Persico, No. CR-92-0351, 1997 WL 867788 (E.D.N.Y. March 13, 1997). The district court granted appellees' motions for a new trial on the basis that the government violated its Brady obligations, Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose information that defendants could have used to impeach the credibility of out-of-court statements made by co-conspirator Gregory Scarpa, Sr., that were admitted at trial under Fed.R.Evid. 801(d)(2)(E).[1] While granting appellees' motions for a new trial, the district court denied their motions to dismiss the indictment altogether based on allegations of "outrageous government conduct." We affirm so much of the district court's order as denied appellees' motions to dismiss the indictment, but reverse so much of the order as granted appellees' motions for a new trial because we conclude that the impeachment evidence withheld by the government does not meet the Bradystandard of "materiality."
 
 I.
 
 2
 This case arises from the deadly internal war within the Colombo Organized Crime Family of La Cosa Nostra (the "Colombo Family") that began in 1991 when the Colombo Family split into two opposing factions--one loyal to the incarcerated "official" boss of the family, Carmine Persico, Jr., and the other loyal to the appointed acting boss, Victor J. Orena. See Persico, 1997 WL 867788, at * 2. The complex details of this intra-family war are described at greater length in the district court's opinion, with which we assume familiarity.
 
 
 3
 On May 13, 1993, a fifteen-count superseding indictment was returned against defendants-appellees--Joseph P. Russo, Anthony Russo, and Joseph Monteleone, Sr.--and co-defendants Alphonse Persico, Joseph Tomasello, Theodore Persico, Sr., Richard Fusco, Robert Zambardi, Lawrence Fiorenza, Lawrence Mazza, and James Delmastro. All three defendants-appellees were charged with violating and conspiring to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), (d). Defendants-appellees, members of the Persico faction, were charged--both as predicate RICO offenses and as separate substantive offenses--with conspiracy to murder members of the Orena faction and with the murders of two particular members of the rival faction, John Minerva and Michael Imbergamo. Joseph and Anthony Russo were also charged--both as independent offenses and as part of the RICO pattern of racketeering--with conspiracy to make extortionate extensions and collections of credit, in violation of 18 U.S.C. §§ 892, 894. Finally, all defendants-appellees were charged with the substantive offense of using and carrying firearms during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). After a ten-week jury trial, Joseph Russo and Monteleone were found guilty of all charges, and Anthony Russo was found guilty of all charges except for the charge of conspiracy to make extortionate collections of credit. See Persico, 1997 WL 867788, at * 1.
 
 The Trial Evidence
 
 4
 The government's evidence at trial came primarily in the form of testimony from four accomplice witnesses--Lawrence Mazza, Carmine Sessa, Joseph Ambrosino (all members of the Persico faction), and Salvatore Micciota (a member of the Orena faction)--and revealed the following:
 
 
 5
 Joseph and Anthony Russo were captains in the Colombo Family, and in 1992, after the intra-family war commenced, Joseph Russo was named acting underboss within the Persico faction; Monteleone was a member of the Russos' crew. See id., 1997 WL 867788 at * 3, * 5. After an unsuccessful attempt by Persico loyalists to kill Victor Orena in June 1991 inflamed tensions within the Colombo Family, Sessa attended a meeting that included the Russos, Monteleone, and others, during which the Russos told Sessa that they would call in their men and tell them to prepare for war with the Orena faction. Miciotta, at the time a member of the Russos' crew, testified that he was called to a meeting by the Russos at which the Russos told him and other members of the crew about the intra-family war, and to ready themselves for it. Following the meeting, Monteleone told Miciotta "that this was an opportunity for all of us to elevate our stature in the family." Id., 1997 WL 867788 at * 2, * 5.
 
 
 6
 A truce organized by representatives of the other organized crime families of La Cosa Nostra broke down in November 1991 when members of the Orena faction attempted to kill Gregory Scarpa, Sr., a soldier in the Persico faction. Mazza testified that immediately after the attempted murder of Scarpa he went with Scarpa to see Anthony Russo, and after being informed of the attempt on Scarpa's life, Anthony Russo said that he would contact Sessa, Joseph Russo and others to let them know that "the shooting started." Id., 1997 WL 867788 at * 2. A meeting was then held at Joseph Russo's grandmother's house in Brooklyn, at which the Persico captains decided to retaliate. Ambrosino testified that Anthony Russo assured him that they were ready to attack the Orena side. He also testified that, sometime after this meeting, Joseph Russo and Theodore Persico told him [Ambrosino] that they, Anthony Russo, and others had attempted to kill Benny Aloi, an Orena captain, but had "just missed." Id. According to Mazza and Sessa, Monteleone participated in a murder attempt on a different member of the Orena faction, Louis Malpeso, which was also unsuccessful. See id., 1997 WL 867788 at * 5.
 
 
 7
 During the early months of 1992, the Russos attended several meetings of Persico faction members to monitor the progress of the war. Sessa and Scarpa repeatedly complained that Scarpa and his crew were the only ones who had actually succeeded in killing any Orena faction members, and that they were unfairly shouldering the burden for all the others. The Russos provided assurances that their associates "were out every day looking for people," particularly those former members of the Russos' crew who had switched allegiances to the Orena side, including John Minerva. See id., 1997 WL 867788 at * 3.
 
 
 8
 On March 25, 1992, John Minerva was killed outside a cafe he owned on Long Island. See id. Michael Imbergamo, who apparently had been providing security for Minerva following an earlier attempt on Minerva's life two weeks prior to his murder, was killed along with Minerva. Eyewitness testimony and telephone records placed Monteleone, in an agitated state, see Trial Transcript at 3542, at a bar and a delicatessen less than two blocks away from Minerva's cafe shortly before Minerva's murder. See 1997 WL 867788, at * 5.
 
 
 9
 Soon after the Minerva/Imbergamo murders, the Russos and other members of the Persico faction, including Scarpa, met at Wolf's Delicatessen in Manhattan. Mazza testified that during this meeting, the Russos admitted their involvement in these murders, bragging that "they had been working on getting [Minerva]" and "finally got to him in front of his cafe," and that they were particularly satisfied because Minerva had worked for Joseph Russo's father for many years before deciding to ally himself with Orena. See id., 1997 WL 867788 at * 4.
 
 
 10
 Unlike Mazza, Sessa testified that he first learned of the Russos' involvement in the murders not from the Russos themselves but from Scarpa. Soon after the murders, and after learning from Scarpa about the Russos' involvement, Sessa attended a meeting of Persico faction members (including Monteleone) at a New York diner. When he entered the meeting Sessa approached Joseph Russo and congratulated him for his "nice work," and Russo accepted the congratulations. Although Minerva's name was not mentioned, Sessa testified that he believed the reason for the congratulations--the killing of Minerva--was well understood by Russo. Sessa thereafter heard from another member of the Persico faction of the Colombo Family--either Joseph Tomasello or Theodore Persico--that Monteleone and another member of the Russos' crew, Tommy Gioeli, as well as a member of Theodore Persico's crew, had committed the Minerva/Imbergamo murders. Sessa, in turn, told Ambrosino that the Russos' crew was responsible for the murders. See id., 1997 WL 867788 at * 3.
 
 
 11
 The case presented by defendants-appellees consisted largely of efforts to discredit the accomplice witnesses, and to portray the cycle of violence that erupted in 1991 as purely a personal vendetta on the part of Scarpa, perpetrated with the aid of Sessa. Defendants-appellees claimed that there was no factional war within the Colombo Family, but merely a "Scarpa/Sessa war." They argued that the attempted murder of Scarpa could be explained by the fact that Scarpa was widely believed to be a government informant, and that, in turn, Scarpa had purely personal motives for murdering his victims--to prevent them from revealing that he was an informant and to retaliate against them for the attempt on Scarpa's life. More generally, defendants-appellees tried to portray Scarpa as "a loose cannon," and "argued to the jury that Scarpa was not a person to be trusted and was in fact an informant." Id., 1997 WL 867788 at * 9. Additionally, the Russos pointed to "the lack of hard evidence to link them to the Minerva and Imbergamo homicides," and challenged Mazza's testimony about the Russos' statements at the Wolf's Delicatessen meeting as uncorroborated and unreliable. Id. Monteleone, whose initial line of defense appeared to be that he could not be placed near the murder scene at the relevant time, see Trial Transcript at 3527-31, 3537-38, 5288, 5319-20, argued in summation that although he was in fact present near the scene shortly before the murders, he had actually been secretly visiting Minerva, with whom he had remained friends despite the war. See 1997 WL 867788, at * 10.
 
 The Withheld Information
 
 12
 Shortly after trial, in response to a discovery request by defense attorneys in a different case, prosecutors for the first time disclosed that Scarpa was in fact a government informant, and had been so since at least 1980. Documents disclosed by the government (principally, internal FBI memoranda called "209s") revealed that Scarpa had provided substantial information to the government during his time as an informant, including information regarding the Orena/Persico war. Most significantly for purposes of this appeal, the 209s also revealed that, in discussions with the FBI, Scarpa had lied about or misrepresented his own involvement in several murders, which he either attributed to the "Persico faction"--without identifying himself as the member of the faction responsible for the murders--or falsely attributed to someone else.[2] See id., 1997 WL 867788 at * 10-11, * 33.
 
 
 13
 Prosecutors also disclosed information--although, according to the district court, it was "produced more slowly," id., 1997 WL 867788 at * 12--regarding a potentially improper relationship that had developed between Scarpa and his FBI contact, Special Agent R. Lindley DeVecchio. It was ultimately revealed that, during Scarpa's years as an informant, DeVecchio may have given Scarpa highly sensitive information that would have helped Scarpa to wage war against the Orena faction and avoid arrest for his own criminal activities, as well as to avert the arrest of his associates and his son for their criminal acts. Suspicions within the FBI regarding this relationship had been strong enough, prior to the commencement of the trial in this case, to trigger an internal investigation. See id., 1997 WL 867788 at * 12-13. Prosecutors were aware both of Scarpa's informant status and of this internal FBI investigation prior to the beginning of the defendants-appellees' trial. See id., 1997 WL 867788 at * 13. In affidavits requested by the district court at the initial argument of the motions that are the subject of this appeal, the prosecutors stated that they had not disclosed Scarpa's informant status or the investigation into alleged improprieties by DeVecchio because they believed that this information was not material under Brady. See id., 1997 WL 867788 at * 13, * 16. Prosecutors had also failed to turn over an FBI report--a so-called "302 report"--in which Mazza revealed his awareness that Scarpa had a law enforcement source whom Scarpa referred to as "the girlfriend" (the "Girlfriend 302"), despite the fact that the court had ordered the production of all Mazza 302s at the outset of trial. See id., 1997 WL 867788 at * 15. The Assistant United States Attorney responsible for the production of the Mazza 302s asserted in her affidavit that she was not aware of the "Girlfriend 302" because it was not turned over to her by the FBI agent from whom she had requested the Mazza 302s. See id., 1997 WL 867788 at * 16. The agent responsible for turning over these documents, in turn, attested that before doing so she consulted with her supervisor, who told her to put aside the two 302s relating to Scarpa's law-enforcement source (including the "Girlfriend 302"), which the supervisor believed should not be distributed outside of the FBI until the FBI had completed its internal investigation. See id.
 
 The District Court's Opinion
 
 14
 In response to these disclosures, the Russos and Monteleone, as well as co-defendants Theodore Persico, Sr. and Lawrence Fiorenza, filed post-trial motions for a new trial, see Fed.R.Crim.P. 33, and for dismissal of the indictment, see Fed.R.Crim.P. 29. Apart from arguing that the "outrageous government conduct" in this case warranted outright dismissal of the indictment, appellees and their co-defendants argued that a new trial was required because the withheld evidence about Scarpa could have been useful to the defense in a number of ways. The district court characterized the proposed theories regarding the usefulness of the Scarpa evidence as follows:
 
 
 15
 1) that it tends to cast doubt on the reliability of the government's investigation of their case; 2) that the testimony of Mazza and Sessa could have been impeached with the new information about their relationship with Scarpa; 3) that Scarpa's hearsay statements could be impeached; 4) that the war in which defendants allegedly participated was in reality a "Scarpa/Sessa" war in which these two pursued their own agenda; 5) that Scarpa himself was pursuing his own agenda, creating the appearance of a factional war for his own purposes; and 6) that the government was the primary proponent of the war.
 
 
 16
 Id., 1997 WL 867788 at * 28.
 
 
 17
 The district court denied the motions to dismiss the indictment, and denied the new-trial motions of co-defendants Theodore Persico, Sr. and Lawrence Fiorenza, but granted appellees' motions for a new trial on all counts except for the loansharking convictions. Id., 1997 WL 867788 at * 1, * 37. The court rejected all of appellees' theories as to why the Scarpa evidence required a new trial, with the exception of one--namely, that certain statements made by Scarpa to his FBI handler could have been used to impeach his out-of-court statements admitted at trial.[3] In particular, the court was concerned with "the Scarpa 209s in which Scarpa blames other members of the Persico faction for murders he indisputably committed." Id., 1997 WL 867788 at * 33. Although these 209s did not, in the court's view, require a new trial for Theodore Persico, Sr. and Lawrence Fiorenza, the court reached a different conclusion with respect to the Russos and Monteleone:
 
 
 18
 The potential impact of these 209s on the jury's findings with respect to the Russos' and Monteleone's involvement in the murders resides in the government's reliance on co-conspirator statements explicitly attributed to Scarpa or which might have been traced to Scarpa as its principal evidence of the Russos' involvement in these murders. Sessa was told of the Russos' culpability by Scarpa; he in turn told Ambrosino. The jury was informed of both of these Scarpa statements. Co-conspirator statements of other nonparticipants, Joseph Tomasello and Theodore Persico, also attributed the murders to the Russos and [Monteleone], but the source of that information was not explored and was arguably Scarpa.
 
 
 19
 Id., 1997 WL 867788 at * 34. Although the court recognized that "[a] substantial amount of evidence" of guilt existed independently of Scarpa's out-of-court statements, id., the court believed that sufficient doubt was cast upon the jury's verdict to require a new trial because "the fact that Scarpa lied to the FBI about some of his murderous activities gives rise to the inference that he lied about this one as well." Id., 1997 WL 867788 at * 35.
 
 
 20
 Having held that a new trial was required on the charges that appellees murdered Minerva and Imbergamo, the court believed it was compelled to grant a new trial as well on the charge of conspiracy to murder members of the Orena faction. While "[t]he independent and untainted evidence clearly demonstrates that the Russos were present at meetings having to do with the war and that Joseph Russo was appointed acting underboss of the family by Carmine Persico as the factions entrenched"--not to mention the clear evidence "link[ing] both Russos to plans to kill other Orena faction members"--the court concluded that "[w]ith doubt cast on [appellees'] involvement in the Minerva and Imbergamo homicides ... none of their other statements or acts makes a finding of guilt of conspiracy inescapable." Id., 1997 WL 867788 at * 35.
 
 
 21
 The government now appeals.
 
 II.
 
 22
 The government's Brady obligation to disclose material evidence favorable to a criminal defendant applies not only to exculpatory evidence, but also to evidence that could be used to impeach government witnesses.[4] See, e.g., United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Giglio v. United States, 405 U.S. 150, 154-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); United States v. Wong, 78 F.3d 73, 79 (2d Cir.1996). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," Kyles v. Whitley, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (internal quotation marks and citations omitted). In other words, evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435, 115 S.Ct. 1555; see United States v. Payne, 63 F.3d 1200, 1209 (2d Cir.1995). This materiality inquiry is a mixed question of law and fact, and "[w]hile the trial judge's factual conclusions as to the effect of nondisclosure are ordinarily entitled to great weight, we conduct our own independent examination of the record in determining whether the suppressed evidence is material." Payne, 63 F.3d at 1209 (internal quotation marks and citations omitted); accord United States v. Zagari, 111 F.3d 307, 320 (2d Cir.1997).
 
 
 23
 Although Kyles made clear that the test of materiality is whether the withheld evidence reasonably undermines confidence in the verdict--not whether sufficient independent evidence exists to support a conviction, see 514 U.S. at 434-35, 115 S.Ct. 1555--the existence of substantial independent evidence of guilt is unavoidably relevant to whether withheld impeachment evidence can reasonably call the jury's verdict into question. See United States v. Avellino, 136 F.3d 249, 257 (2d Cir.1998) ("In general, evidence whose function is impeachment may be considered to be material where the witness in question supplied the only evidence linking the defendant to the crime. Similarly, impeaching matter may be found material where the witness supplied the only evidence of an essential element of the offense.") (citations omitted), reh'g denied, 1998 WL 195636 (2d Cir. Apr.23, 1998) (per curiam); Payne, 63 F.3d at 1210 ("[A] new trial is generally not required when the testimony of the witness [as to whom impeachment evidence has been withheld] is 'corroborated by other testimony.' ") (quoting United States v. Petrillo, 821 F.2d 85, 89 (2d Cir.1987)). Where substantial evidence of guilt entirely unrelated to the withheld impeachment evidence exists, it will be more difficult to argue that there is a reasonable probability that the withheld evidence, if disclosed, would have resulted in a different verdict. See, e.g., Zagari, 111 F.3d at 321 (concluding that impeachment evidence regarding government witness was immaterial where testimony was corroborated by independent evidence); Payne, 63 F.3d at 1210-11 (same).
 
 
 24
 In the instant case, as the district court recognized, "[a] substantial amount of evidence independent of Scarpa's co-conspirator statements remains to link the Russos and Monteleone to these murders." 1997 WL 867788, at * 34. The most compelling evidence of the Russos' guilt--which, indeed, is difficult to reconcile with the district court's characterization of Scarpa's coconspirator statements as the government's "principal" evidence, see id., 1997 WL 867788 at * 34--was Mazza's testimony about the meeting at Wolf's Delicatessen, at which the Russos proudly boasted that they had succeeded in killing Minerva. This testimony by Mazza was entirely independent of Scarpa's coconspirator statements. Additionally, Sessa testified that Joseph Russo accepted congratulations for the Minerva/Imbergamo murders, and even if Sessa first learned of appellees' responsibility from Scarpa, Joseph Russo's acceptance of credit constitutes independent evidence of guilt. Moreover, the evidence showed that the Russos had an even greater motive to kill Minerva than to kill other members of the Orena faction, in light of his defection to the Orena side after having worked for Joseph Russo's father for many years; indeed, the testimony of Mazza showed that the Russos had proclaimed their intent to specifically target defectors such as Minerva, see id., 1997 WL 867788 at * 3. With respect to Monteleone, compelling direct evidence, including telephone records and eyewitness testimony, placed him near the scene of the murders shortly before they took place.[5]
 
 
 25
 While we recognize, again, that the test for materiality "is not a sufficiency of evidence test," Kyles, 514 U.S. at 434, 115 S.Ct. 1555, the strength of the independent evidence of appellees' guilt increases the degree of significance that would need to be ascribed to the withheld impeachment evidence in order for it reasonably to undermine confidence in the verdict. Our conclusion that the district court erred in granting a new trial is ultimately based on the fact that the court gave undue weight to the impeachment evidence itself. Defendants already had in their possession absolutely devastating evidence with which to assail Scarpa's credibility; among the many crimes Scarpa had committed were numerous murders and attempted murders, not to mention his unrealized plans to murder Ambrosino's mother and his own daughter-in-law. Indeed, throughout Joseph Russo's summation counsel attacked Scarpa's credibility, casting him as the lone uncontrollable villain who was perpetrating a personal campaign of violence that the government had mistaken for a factional war within the Colombo Family. See Trial Transcript at 5810, 5981-86, 6007-10, 6015. It is well settled that where ample ammunition exists to attack a witness's credibility, evidence that would provide an additional basis for doing so is ordinarily deemed cumulative and hence immaterial. See, e.g., Avellino, 136 F.3d at 257-59; Zagari, 111 F.3d at 320-21; United States v. Amiel, 95 F.3d 135, 145 (2d Cir.1996); United States v. Gambino, 59 F.3d 353, 366-67 (2d Cir.1995), cert. denied, 517 U.S. 1187, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996); United States v. Orena, 32 F.3d 704, 717 (2d Cir.1994); United States v. Locascio, 6 F.3d 924, 949-50 (2d Cir.1993), cert. denied, 511 U.S. 1070, 114 S.Ct. 1645, 1646, 128 L.Ed.2d 365 (1994); United States v. Rosner, 516 F.2d 269, 273-74 (2d Cir.1975), cert. denied, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). Accordingly, in light of Scarpa's long and depraved criminal history, his misrepresentations to the FBI about his own involvement in certain murders was merely cumulative evidence of his lack of credibility, or his "deviousness," 1997 WL 867788, at * 35 ("Based on the Scarpa 209s discussed above, I find that there is a reasonable probability of a different outcome in this case had the jury been aware of Scarpa's deviousness as revealed in the 209s.").
 
 
 26
 However, it seems clear that the district court did not rely on the Scarpa 209s merely as evidence that Scarpa was not generally credible and that any statements attributed to him should be viewed with skepticism, but as evidence that he was in the particular habit of blaming others for murders he had committed. In other words, in the view of the district court, Scarpa's lies to the FBI about murders actually committed by him give rise to a direct inference that he may have lied to his co-conspirators about the Minerva/Imbergamo murders, and that he may have committed those murders himself. See id. ("[T]he fact that Scarpa lied to the FBI about some of his murderous activities gives rise to the inference that he lied about this one as well."). Contrary to the district court, we believe that only the weakest of inferences can be drawn from the 209s to support the argument that Scarpa lied to his co-conspirators and actually committed the Minerva/Imbergamo murders himself. Particularly in light of the substantial independent evidence of appellees' guilt, this inference is simply too weak to warrant a new trial.[6]
 
 
 27
 The fact that Scarpa, in conversations with the FBI, failed to indicate his own involvement in certain murders or accused others of murders he committed, provides scant support for the inference that, in conversations with his own co-conspirators, he falsely attributed the murders of Minerva and Imbergamo to appellees, even though he actually committed them himself. It would have been perfectly sensible for Scarpa to tell the FBI that others had committed murders actually carried out by him and his crew--namely, to minimize the risk that he would lose FBI protection by admitting his involvement in these homicides. At the same time, among his co-conspirators, murdering Minerva and Imbergamo would have been a badge of honor, and Scarpa would have had good reason to take credit for the murders if indeed he had committed them. Cf. United States v. Friedman, 854 F.2d 535, 570 (2d Cir.1988) ("Specific issues of whether a declarant's past conduct may actually cast doubt on the credibility of his statements must be determined by comparing the circumstances of the past conduct with those surrounding the hearsay statements admitted into evidence.") (internal punctuation and citation omitted).
 
 
 28
 We do not suggest that there are no plausible reasons why Scarpa might have falsely told his co-conspirators that the Russos and their crew committed the Minerva/Imbergamo murders even if he committed them himself. For example, Scarpa might have been worried that other members of the Persico faction of the Colombo Family were, like Scarpa himself, government informants, and that word of his responsibility for the murders would get back to the FBI. However, nothing prevented appellees from raising any such arguments as to why Scarpa might have had a motive to lie to his co-conspirators about the Minerva/Imbergamo murders. The point is simply that such arguments would have gained little direct support from the evidence that Scarpa lied about other murders to the FBI. Notwithstanding Scarpa's close relationship with the FBI, the two contexts are entirely different, and only an exceedingly weak inference--too weak to create a "reasonable probability" of a different verdict--can be drawn connecting Scarpa's misrepresentations in one context to his alleged misrepresentations in the other.
 
 III.
 
 29
 Appellees Joseph and Anthony Russo argue that, even if the district court erred in finding the withheld evidence to be material, we should nonetheless affirm the order granting a new trial or we should direct the dismissal of the indictment altogether in light of "outrageous government conduct." The district court gave careful consideration to the serious charges of misconduct in this case, and substantially for the reasons stated by the district court, see 1997 WL 867788, at * 18-24, we do not believe that either dismissal of the indictment or a new trial is warranted. With respect to the FBI's failure to turn over the "Girlfriend 302" to prosecutors, thereby depriving the prosecutors of the ability to fulfill their Brady obligations, we join the district court in emphasizing that while the FBI may have had compelling reasons to believe that this document should not be disclosed, under such circumstances "it is necessary for the government to take the Court into its confidence, through sealed and ex parte application, so that the need for disclosure can be adjudicated prior to trial." Id., 1997 WL 867788 at * 23. Nonetheless, we also agree with the district court that neither the failure to disclose the Girlfriend 302 nor any of the other actions by the government requires dismissal of the indictment; nor do we believe that they require a new trial.
 
 IV.
 
 30
 In sum, evidence that Scarpa lied to the FBI about murders he committed provides little direct support for the conclusion that he also lied to his own co-conspirators about who was responsible for the murders of Minerva and Imbergamo. To the extent that this evidence could have been used in a broader fashion to attack Scarpa's credibility--rather than to support a direct inference that, because he lied to the FBI, he also lied to his co-conspirators--the devastating impeachment evidence already available to defendants rendered this new evidence cumulative. Finally, the fact that substantial evidence of guilt existed that was entirely unrelated to the credibility of Scarpa's co-conspirator statements makes it all the more clear that the withheld impeachment evidence does not support a "reasonable probability" of a different verdict.
 
 
 31
 We have considered all of appellees' arguments, and find them to be without merit. The judgment of the district court is affirmed insofar as it denied appellees' motions to dismiss the indictment, reversed insofar as it granted appellees' motions for a new trial, and remanded to the district court with instructions to enter a judgment in accordance with the verdict of the jury finding Joseph Russo and Joseph Monteleone, Sr. guilty of all charges and Anthony Russo guilty of all charges other than the charge of conspiracy to make extortionate collections of credit, and for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Denis R. Hurley, of the United States District Court for the Eastern District of New York, sitting by designation
 
 
 [1]
 Rule 801(d)(2)(E) provides that "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy" is "not hearsay."
 
 
 [2]
 Although the district court does not explain exactly how it is known that these murders were "indisputably committed" by Scarpa, 1997 WL 867788, at * 33, the government does not challenge this assertion
 
 
 [3]
 Notably, in moving for a new trial appellees had given relatively little attention to this argument. Instead, they had relied primarily on the arguments that Scarpa's role as an informant precluded the admission of his out-of-court statements under the co-conspirator hearsay exception, and that the withheld evidence could have been used to show that there was no Orena/Persico war, but merely a personal war waged by Scarpa, with the help of Sessa and the FBI
 
 
 [4]
 "It is well settled that evidence is not considered to have been suppressed within the meaning of the Brady doctrine if the defendant or his attorney either knew, or should have known of the essential facts permitting him to take advantage of that evidence." United States v. Torres, 129 F.3d 710, 717 (2d Cir.1997) (internal punctuation and citation omitted). Although appellees suspected that Scarpa was an informant, and argued as much to the jury, this was merely a suspicion, and in any event appellees lacked evidence of the specific information exchanged between Scarpa and the FBI that has now become available. Accordingly, the government does not rely on the argument that Brady was not violated because appellees were already sufficiently aware of Scarpa's informant status
 
 
 [5]
 The evidence that appellees, particularly the Russos, participated in the conspiracy to murder members of the Orena faction--as opposed to having succeeded in murdering Minerva and Imbergamo--was overwhelming. While noting that the "independent and untainted evidence" clearly placed the Russos at meetings during which the factional war was discussed, and connected them to plans to kill other Orena faction members, the district court nonetheless believed that it was compelled to grant a new trial on the conspiracy charge because "[w]ith doubt cast on their involvement in the Minerva and Imbergamo homicides ... none of [appellees'] other statements or acts makes a finding of guilt of conspiracy inescapable." 1997 WL 867788, at * 35. Contrary to the district court, we believe that at least the Russos (if not Monteleone) were "inescapabl[y]" guilty of conspiracy to murder members of the Orena faction irrespective of any evidence regarding the Minerva/Imbergamo murders. Inasmuch as we also reverse the district court's grant of a new trial on the murder charges, however, we have no need to separately address this issue
 
 
 [6]
 The fact that Scarpa lied to the FBI about his own involvement in other murders does not, in and of itself, constitute affirmative evidence that he (and not appellees) murdered Minerva and Imbergamo. Indeed, significantly, appellees introduced no evidence whatsoever that Scarpa murdered Minerva and Imbergamo, despite the fact that--had appellees been innocent of these murders--they would have had every reason to suspect Scarpa. We note this not because we are placing any affirmative burden on defendants to disprove the government's case, but merely because the district court's conclusion that the Scarpa 209s could have supported a reasonable inference that Scarpa lied to his co-conspirators and that Scarpa, rather than appellees, murdered Minerva and Imbergamo, would have been strengthened if there had been any independent evidence connecting Scarpa to these murders. Our conclusion that the Scarpa 209s do not support a reasonable probability of a different verdict does not ultimately rest on the lack of any evidence in this record that Scarpa murdered Minerva and Imbergamo, but on the fact that Scarpa's lies to the FBI are only minimally probative of whether he lied to his co-conspirators. See infra