**UNITED STATES of America, Appellee,**

v.

**Theodore PERSICO, Robert Zambardi, and Richard Fusco, Defendants–Appellants.**

Docket Nos. 97–1456L, 97–1457, 98–1008CON.

United States Court of Appeals, Second Circuit.

Argued Sept. 3, 1998.

Decided Jan. 15, 1999.

Barry M. Fallick, New York, N.Y. (Bobbi C. Sternheim, Rochman Platzer Fallick & Sternheim, New York, N.Y., on the brief), for defendant-appellant Persico.

Herald Price Fahringer, New York, N.Y. (Erica T. Dubno, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, New York, N.Y.; James R. Froccaro, Jr., Garden City, N.Y., on the brief), for defendant-appellant Zambardi.

Bennett M. Epstein, New York, N.Y. (Marvin B. Segal, Crocco & De Maio, New York, N.Y., on the brief), for defendant-appellant Fusco.

George A. Stamboulidis, Asst. U.S. Atty., Brooklyn, N.Y. (Zachary W. Carter, U.S. Atty., David C. James, Ellen M. Corcella, Andrew Weissmann, Asst. U.S. Attys., Brooklyn, N.Y., on the brief), for appellee.

Before: NEWMAN, CARDAMONE, and PARKER, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

These appeals by three defendants who participated in a street war between factions of an organized crime family primarily present issues arising from the Government's failure, before trial, to disclose both the informant role of a co-conspirator and aspects of an FBI agent's allegedly outrageous conduct in dealing with the informant. In particular, we are required to apply the standard for granting a motion to withdraw a guilty plea, after conviction but before sentencing, on the ground of newly discovered *Brady/Giglio* material. These issues arise on appeals from judgments of the District Court for the Eastern District of New York (Charles P. Sifton, Chief Judge) convicting Theodore Persico, Richard Fusco, and Robert Zambardi of racketeering offenses.

Persico was convicted, after a ten-week jury trial, of racketeering and racketeering conspiracy, conspiracy to commit murder in aid of racketeering, loansharking, and carrying a firearm in connection with crimes of violence. Fusco was convicted, on a plea of guilty, of racketeering conspiracy. Zambardi was convicted, also on a plea of guilty, of a substantive count of racketeering. Fusco and Zambardi challenge the denial of their motions to withdraw their guilty pleas. Persico and Zambardi seek dismissal of the indictment because of allegedly outrageous government misconduct, or, alternatively, a new trial for Persico and an initial trial for Zambardi. Persico also seeks reversal of his firearms conviction, as well as a remand for resentencing because of an allegedly insufficient sentencing proceeding. We affirm the judgments in all respects.

## Background

*The charges and the Persico trial.* The charges in this case arose from an internal war between the Persico and the Orena factions of the Colombo organized crime family, which was fought on the streets of New York City from mid–1991 through the end of 1994. The war was the subject of numerous indictments and has already precipitated several decisions of this Court, which recount its complex details.[1]

Appellant Persico, the brother of the Colombo family boss, Carmine Persico, Jr., was a member of the Persico faction. He was tried in this case with four other members of that faction, Joseph and Anthony Russo (hereinafter "the Russos"), Joseph Monteleone, and Lawrence Fiorenza. Appellants Fusco and Zambardi, who pled guilty, were also members of the Persico faction.

The trial focused on a conspiracy among members of the Persico faction to murder members of the Orena faction and on three murders of Orena faction members that occurred during the conspiracy: John Minerva and Michael Imbergamo, killed in one incident, and Lorenzo Lampesi, killed separately. Evidence was also presented showing many other incidents in which one or more of the defendants plotted or attempted to kill members of the Orena faction.

The proof consisted largely of the testimony of four cooperating accomplice witnesses: Carmine Sessa (the former consigliere of the Colombo family's Persico faction), Lawrence Mazza, Joseph Ambrosino (both lower-level soldiers in the Persico faction), and Salvatore Miciotta (a soldier in the Orena faction). These witnesses all testified from their personal knowledge of the conspiracy and the murders, and the defendants' participation in them. Their testimony was corroborated by tape-recorded conversations, law enforcement surveillances, and evidence seized through lawful searches.

Persico's defense consisted mainly of attacks on the credibility of the Government witnesses. Persico attempted to show that he was not involved in a conspiracy to murder and that there was no real war at all, but only a series of personal vendettas of Sessa and Gregory Scarpa, Sr., a soldier in the Persico faction, who is the central figure in the claim of outrageous government conduct discussed below. In one claim relevant to this appeal, Persico contended that he never

---

1. *See United States v. Orena,* 145 F.3d 551 (2d Cir.1998); *United States v. Malpeso,* 115 F.3d 155 (2d Cir.1997); *United States v. Orena,* 32 F.3d 704 (2d Cir.1994); *United States v. Brady,* 26 F.3d 282 (2d Cir.1994); *United States v. Amato,* 15 F.3d 230 (2d Cir.1994); *United States v. Orena,* 986 F.2d 628 (2d Cir.1993).

carried a firearm to his meetings with the other members of the faction. He conceded that he was a member of the Colombo family and that he might be guilty of usury, but claimed that there was no evidence of violence or the threat of violence when he extended or collected loans. When the Government showed that he had been bringing messages from the imprisoned family boss, his brother Carmine, Persico claimed that the messages counseled "peace." The jury found Persico guilty of racketeering, 18 U.S.C. § 1962(c), racketeering conspiracy, 18 U.S.C. § 1962(d), conspiracy to murder in aid of racketeering, 18 U.S.C. § 1959(a)(5), loan-sharking conspiracy, 18 U.S.C. §§ 892, 894, and carrying a firearm in connection with crimes of violence, 18 U.S.C. § 924(c)(1).

*The Scarpa disclosure.* After Persico's trial, the Government made several disquieting disclosures concerning Scarpa, the Persico faction member who had been identified at trial as a target of an assassination attempt by the Orena faction. First, the Government acknowledged that for many years Scarpa had been an informant for the FBI. Second, it was disclosed that Scarpa had lied about or misrepresented his own involvement in some of the murders occurring during the intra-family war and had falsely attributed some of these murders to others. Finally, it was disclosed that Scarpa's "handling" FBI agent, R. Lindley DeVecchio, might have improperly given Scarpa sensitive FBI information that would have helped him wage war against the Orena faction and also avoid the arrest of himself and others. *See United States v. Orena,* 145 F.3d 551 (2d Cir.1998).

Following the disclosures, Persico and his four trial co-defendants supplemented their previously filed motions for a new trial. In essence, they claimed that the prosecution had violated its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, by failing to disclose exculpatory evidence that Scarpa was an informant. They argued that (1) because Scarpa was an informant, his out-

of-court statements should not have been admitted as co-conspirator hearsay, (2) the Scarpa hearsay and its misrepresentations so permeated and tainted the proceedings as to undermine confidence in the verdict, (3) certain material in the FBI reports concerning Scarpa could have been used to impeach the credibility of the out-of-court declarations, and (4) in dealing with Scarpa, DeVecchio had engaged in "outrageous conduct" requiring the dismissal of the indictments.[2] The District Court granted the motion for a new trial of the Russos, except as to the loan-sharking convictions, and granted the motion of Monteleone (who was not charged with loan-sharking) in its entirety. The Court denied the motions of Persico and Fiorenza.

Chief Judge Sifton found that certain statements made by Scarpa to DeVecchio, undisclosed by the Government before trial, could have been used to impeach the out-of-court statements of Scarpa that were admitted as co-conspirator statements. The undisclosed impeachment material that the District Court found mandated a new trial as to the Russos and Monteleone were statements Scarpa made to the FBI "in which Scarpa blame[d] other members of the Persico faction for murders he indisputably committed." *United States v. Persico,* No. CR–92–0351, 1997 WL 867788, at *33 (E.D.N.Y. Mar. 13, 1997). As Chief Judge Sifton explained:

> While I remain confident that the jury was correct in finding that [the Russos and Monteleone] were members of the criminal enterprise described in the indictment and participated in the conduct of the affairs of that enterprise by joining in the Persico war, I am not confident that the jury would have found that they did so by engaging in the specific pattern of racketeering activity with which they were charged, namely, a pattern which included the murders of Minerva and Imbergamo. After a review of the Scarpa 209s released by the government, my confidence in the verdict of guilty on these counts is substantially

---

**2.** Motions on similar grounds were made before Judge Weinstein after the convictions of Victor Orena and Pasquale Amato, members of the Orena faction. Judge Weinstein denied the motions

in their entirety. *See Orena v. United States,* 956 F.Supp. 1071 (E.D.N.Y.1997), *aff'd,* 165 F.3d 15, 1998 WL 801866 (2d Cir.1998) (table).

**800**

undermined, and a new trial is ordered as to these defendants.

*Id.* On the Government's appeal of the decision awarding new trials to the Russos and Monteleone, this Court reversed. *See Orena,* 145 F.3d at 560–61.

As noted, the District Court denied Persico's motion for a new trial. Chief Judge Sifton's rationale included the following:

> The record is replete with evidence that Theodore Persico conspired with others, including Sessa and Ambrosino, to plan murders separate and apart from those perpetrated by Scarpa or in which he had any hand. Thus, evidence of Persico's overt plotting to kill Cutolo and others is wholly unperturbed by the revelations of Scarpa's other activities. Given the substantial evidence in the record relating Theodore Persico's attendance at meetings to discuss the war, his travels to visit his brother Carmine to pass along messages of support, and his own active efforts to plan and participate in murders, I conclude that the evidence relating to Scarpa's involvement with DeVecchio and the FBI, taken in its entirety, had no reasonable probability of altering a jury's finding that Theodore Persico was guilty of conspiracy to murder. Nothing in the disclosed 209 reports undermines confidence in Theodore Persico's involvement in these crimes.

*Persico,* 1997 WL 867788, at *32.

After denial of his post-trial motion, Persico received a sentence that included 210 months plus a consecutive term of 60 months on the firearms charge.

*Zambardi's guilty plea.* Zambardi was originally charged in five counts of the indictment with substantive and conspiracy RICO violations, conspiracy to murder, using and carrying a firearm in connection with the murder conspiracy, loan-sharking conspiracy, and possession of a firearm by an ex-felon. At the start of Persico's trial, Zambardi pled guilty to one count of racketeering, 18 U.S.C. § 1962(c), pursuant to a plea agreement stipulating to a 15–year term of imprisonment. If convicted on all counts, Zambardi would have faced life imprisonment.

Following the disclosure of Scarpa's role as an informant, Zambardi moved to withdraw his plea. He relied on *Brady* and its progeny, and also alleged that the Government had engaged in "outrageous conduct." Zambardi claimed that if he had known these newly disclosed facts, he would not have pled guilty.

The District Court denied the motion, finding that the evidence against him was overwhelming. The Court also analyzed the legitimate use that Zambardi might have made of the newly disclosed information and concluded that it would have been immaterial to Zambardi's trial and to his decision to plead guilty, because there was ample direct evidence against Zambardi without resort to the Scarpa hearsay. Thus, any impeachment of Scarpa's statements would have been of no value to Zambardi. In Chief Judge Sifton's view, Zambardi was not seeking to withdraw his plea for any reason other than to try to bargain for an even more lenient sentence. After denial of his post-plea motion, Zambardi received a sentence that included a term of 15 years.

*Fusco's guilty plea.* Fusco was charged with substantive and conspiracy RICO violations, conspiracy to murder, loan-sharking conspiracy, using and carrying a firearm in connection with these crimes, and illegal possession of a firearm and ammunition by an ex-felon. If convicted on all counts at trial, he faced life imprisonment.

At the start of the trial in February 1994, Fusco requested and was granted a severance on the ground that he did not have the physical stamina to endure a trial; the severance came after repeated delays in the early stages of the trial due to Fusco's heart disease, hypertension, and other ailments. In May 1994, on the eve of his scheduled separate trial, Fusco tendered a plea of guilty to one substantive count of racketeering, pursuant to a plea agreement for a 14–year term of imprisonment.

At the plea allocution, Fusco informed the Court of his health problems. Chief Judge Sifton ascertained that the plea was knowing, intelligent, and voluntary, and supported by an adequate factual basis, but he nevertheless deferred decision on whether to accept the plea agreement and the plea. *See* Fed.

R.Crim.P. 11(e)(2). After the Scarpa disclosures, Fusco moved to withdraw his guilty plea pursuant to Fed.R.Crim.P. 32(e), apparently treating it as if it had been accepted. The Court denied the motion, reasoning that the information about Scarpa would not have affected impeachment of the potential witnesses against Fusco, exculpation of Fusco, or Fusco's plea itself. Fusco does not seek review of that decision.

After the plea, Fusco was under the care of the Bureau of Prisons Federal Medical Centers. Over the next three years, Fusco's health deteriorated; he was given a coronary triple bypass, and malignant cancer was discovered in one of his kidneys, which was subsequently removed. His doctors felt that the combination of these two ailments, combined with his severe hypertension (from which he had been suffering for decades), meant, as they reported, that "this man is virtually under a death sentence." One doctor also wrote, "I would not be very sanguine about his surviving fourteen years incarcerated in a general prison." Fusco was incarcerated in various federal prison hospitals for about five years; throughout the period, the Court had neither accepted nor rejected the plea agreement or the plea.

In November 1997, Fusco moved, purportedly pursuant to Rule 32(e), to reject the plea agreement. He hoped that the Court would reject the plea agreement and, in view of the defendant's diminished life expectancy, impose less than the bargained-for sentence. Fusco's counsel argued that under the provisions of Rule 11(e)(1)(C), plea withdrawal was the only way to achieve a sentence of less than 14 years, which was not only the agreed-upon sentence but also the low end of the applicable range under the Sentencing Guidelines. Chief Judge Sifton asked the parties and the Department of Probation to prepare proposed Guidelines analyses, without taking into account Fusco's health problems, to aid in deciding whether to accept or reject the plea agreement. *See* Fed. R.Crim.P. 11(e)(2) ("[T]he court may ... defer its decision ... until there has been an opportunity to consider the presentence report."). The analyses submitted by Fusco, the Government, and the Probation Department were not in agreement.

On December 17, 1997, Chief Judge Sifton announced that he would adopt the Probation Department's Guidelines analysis, which reflected the highest offense level of the three proposals. He further stated that he would treat the defendant's "Rule 32(e) plea withdrawal motion" as a motion for a downward departure and that if the defendant presented a valid reason to depart below the applicable Guidelines range, he would then reject the plea agreement. In response, Fusco's counsel described the deterioration in Fusco's health, and argued that his circumstances had materially changed since he had tendered his guilty plea.

The Government responded that Fusco had not established any extraordinary medical conditions to warrant entitlement to a departure. In the Government's view, the only relevant fact for departure purposes was that the medical staff of the Bureau of Prisons was able to provide adequate care for Fusco. Chief Judge Sifton agreed with the Government's approach. Analyzing the issue solely as a request for a departure, rather than as an effort to meet Rule 32(e)'s requirement of "any fair and just reason" for presentence withdrawal of a plea, he said, "I find myself unable to depart from the low end of the guidelines that apply. Accordingly, I am accepting the plea agreement and sentencing the defendant to the custody of the Attorney General ... for a period of 168 months [14 years]...."

## Discussion

### I. Motions for Dismissal of Indictment or New Trial

This Court's recent decision in *Orena*, 145 F.3d at 560–61, has entirely disposed of Persico's and Zambardi's motions for dismissal of the indictment or a new trial (in Zambardi's case, an original trial). That decision held that the Scarpa disclosures did not warrant the new trials that Chief Judge Sifton had ordered for the three co-defendants tried with Persico. *See id. A fortiori,* we are compelled to rule that the disclosures do not warrant a new trial for Persico or Zambardi,

of whose guilt the District Court found sufficient independent evidence to deny their motions. *See Persico,* 1997 WL 867788, at *32.

For the same reasons articulated in *Orena,* 145 F.3d at 560, we also affirm the District Court's denial of both Persico's and Zambardi's motions to dismiss the indictment for outrageous government conduct. As indicated in that opinion, Chief Judge Sifton's analysis of the Government's conduct, *see* 1997 WL 867788, at *18–*24, was sound, and we agree with him that the Government's actions do not warrant either dismissal of the indictment or a new trial. *See Orena,* 145 F.3d at 560.

## II. Persico's Firearms Charge

■ Persico challenges his conviction for violation of 18 U.S.C. § 924(c), using and carrying a firearm during and in relation to a crime of violence (here, the conspiracy to murder members of the Orena faction), on the ground that the evidence presented at trial was insufficient to show that he used or carried a firearm, or that he aided or abetted the use or carrying of a firearm. Applying the usual standards for considering the sufficiency of the evidence, *see United States v. Canady,* 126 F.3d 352, 356 (2d Cir.1997) (rejecting a sufficiency challenge to an 18 U.S.C. § 924(c)(1) conviction), we conclude that Persico's claim cannot succeed.

The cooperating witness Mazza testified as follows:

Q. Did you see any guns?

A. There was just one gun. When we were all leaving, Teddy Persico showed me a little pistol, a .22 that he carried in his pocket, a tiny one.

Q. Did he say anything about it?

A. That was his protection.

In addition, Mazza testified that Persico's wife came out of Persico's house and gave him and Sessa a bag containing a MAC–10 machine-gun and a silencer. Mazza and Sessa testified that they had a co-conspirator test the machine-gun in the woods of Staten Island.

■ Persico endeavors to relate his insufficiency claim to the "use" and "carry" prongs of section 924(c)(1). In this Circuit,

the "carry" prong is satisfied if the evidence establishes that, during and in relation to the underlying crime, the defendant either (1) had physical possession of the firearm, or (2) moved the firearm from one place to another. *See Canady,* 126 F.3d at 358. We have held that conspiracy to commit crimes of violence is a sufficient predicate crime of violence for the purposes of 18 U.S.C. § 924(c). *See United States v. Elder,* 88 F.3d 127, 129 (2d Cir.1996). Defendants convicted of aiding and abetting are liable as principals. *See* 18 U.S.C. § 2(a).

Persico relies chiefly on *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), in which the Supreme Court held that the "use" prong of the statute is not satisfied by "the inert presence of a firearm, without more," *id.* at 149, 116 S.Ct. at 508. He argues that even if the jury believed the trial testimony, the evidence did not show that Persico actively employed a firearm by "brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire a firearm." *Id.* at 148, 116 S.Ct. 501. Furthermore, on the aiding-and-abetting count relating to the MAC–10 and silencer, Persico argues that *United States v. Pipola,* 83 F.3d 556 (2d Cir.1996), requires reversing his section 924(c) conviction. In *Pipola,* a case decided in light of *Bailey,* we reaffirmed our earlier holding in *United States v. Medina,* 32 F.3d 40 (2d Cir.1994), that a defendant charged with aiding and abetting the violation of section 924(c) must be shown to have known of the underlying crime, to have had an interest in furthering it, and consciously to have assisted others in the use or carrying of weapons in the underlying crime. *See Pipola,* 83 F.3d at 562–65. Persico argues that, like the defendant in *Medina,* he lacked the specific intent to bring about the use of a firearm in connection with a violent crime.

These two arguments fail to counter the weight of contrary case law and common sense. Most important, Persico's argument on appeal ignores the "carry" prong of the statute. *Bailey* recognized that "[t]he 'carry' prong of § 924(c)(1) ... brings some offenders who would not satisfy the 'use' prong

within the reach of the statute." 516 U.S. at 150, 116 S.Ct. at 509.

■ The fact that the Government argued for "use" in the District Court and for "carrying" in this Court is not significant. *See United States v. Giraldo*, 80 F.3d 667, 674–76 (2d Cir.1996) (when indictment charges defendants with both using and carrying weapon, conviction proper if evidence supports either use or carrying). Furthermore, the Supreme Court has more recently ruled that "carrying," for purposes of section 924(c), broadly includes the possession of a firearm in a trunk or a glove compartment, even if not "readily accessible." *See Muscarello v. United States*, 524 U.S. 125, —— —— ——, 118 S.Ct. 1911, 1916–19, 141 L.Ed.2d 111 (1998).

Persico's argument seems to assume that because the murder of Amato was never accomplished and because Persico never actually used the .22 pistol that he showed to Ambrosino, there was no nexus between the possession of the guns and any crimes of violence. This argument ignores this Court's holding in *Elder*, 88 F.3d at 129, that conspiracy to murder provides the underlying violent felony required for conviction under section 924(c). The jury could reasonably find that the conspiracy to murder began with the outbreak of the Persico/Orena war and did not end until the arrests of the principals. The fact that Persico himself was not convicted of murder and may not have "use[d]" a firearm in furtherance of the conspiracy is irrelevant. Persico's "carry[ing]" of the .22 and the MAC–10 during this period of murder and violence, in which plans to kill were constantly hatched, consummated, or discarded, was sufficiently "during and in relation to" the furtherance of the conspiracy.

Moreover, for the purposes of aiding and abetting, there is ample evidence that Persico was aware of the murder conspiracy and interested in its goals, both the killing of Orena faction members and the ascendancy of the Persico faction. Sessa testified that he told Persico that the plan to kill Amato had repeatedly been unsuccessful, and that a silencer would be helpful in completing the

task. Persico then provided (at least) the silencer. From this statement, combined with Mazza's and Sessa's testimony about the MAC–10, a reasonable trier of fact could easily infer specific intent to aid and abet the carrying of a firearm in connection with the contemplated crime. The testing of the machine-gun and silencer by Sessa and Ambrosino surely constituted "active employment," *i.e.*, use of a firearm "during and connection with" a crime of violence—if not murder, at least conspiracy to murder or attempted murder.

For all these reasons, we reject Persico's challenge to his section 924(c) conviction.

III. Persico's "Organizer/Leader" Enhancement

■ The Sentencing Guidelines authorize a four-level increase of the defendant's base offense level if he was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1; *see United States v. Patasnik*, 89 F.3d 63, 68 (2d Cir.1996). Persico challenges the District Court's "organizer or leader" enhancement of his sentence, contending (1) that he was not a leader or organizer, and (2) that Chief Judge Sifton did not make sufficient factual findings to support the enhancement.

There was sufficient evidence to support the enhancement. The trial record indicates that Persico was a central leader and planner, who organized a number of unconsummated murder conspiracies and communicated important messages from his brother, the boss of the Colombo crime family, to the other capos and soldiers of the Persico faction.

■ As to the adequacy of the District Court's findings, Persico relies on cases in which this Court has remanded for "specific factual findings" as to a defendant's role, when a district court has either not stated on the record the specific factual basis of the enhancements or not specifically adopted the Probation Department's presentencing report.[3] *See, e.g., United States v. Carrozzella,*

---

3. It is clear that the District Court did not adopt the Probation Department's calculations. The

105 F.3d 796, 804 (2d Cir.1997); *Patasnik,* 89 F.3d at 69; *United States v. Liebman,* 40 F.3d 544, 549 (2d Cir.1994); *United States v. Fermin,* 32 F.3d 674, 682 (2d Cir.1994).

At sentencing, Chief Judge Sifton made the following findings:

> I am not prepared on this record to reach a conclusion beyond a reasonable doubt that Mr. Persico had an actual agreement ... to murder these specific individuals who got murdered.... I am prepared, however, to find that Mr. Persico, beyond a reasonable doubt, conspired to murder at least five individuals who fortunately escaped being murdered, ... Victor Orena.... Mr. C[u]tolo, Pasquale Amato, Salvator[e] Misciotta and Joe [Baud]anza.

As the government argues as an alternative argument to the one they ... pursued most vigorously, Mr. Persico's role in at least the C[u]tolo, Amato and Misciotta conspiracy, was that of an organizer, which would mean that there must be an upward role adjustment. The adjustment takes the offense level before adjustment for multiple offenses to a level 32. Because I find that at least five individuals were targeted for these unsuccessful conspiracies, the adjustment for multiple offenses is 4, which would bring the total offense level to a level 36.

Toward the end of the sentencing hearing, Chief Judge Sifton added:

> My law clerk is pointing out to me that the role adjustment requires a finding that the criminal activity involved five or more participants or was otherwise extensive, and I have absolutely no trouble in making that finding as well.

Though the findings were not as precise as they might have been, we have recognized that district courts have some latitude concerning supervisory role findings when the court makes a specific determination, even though somewhat conclusory, about the *reasons* for the finding. *See, e.g., United States v. DeRiggi,* 72 F.3d 7, 8–9 (2d Cir.1995) (highest-ranking taxi inspector defendant in

corruption case was properly assessed four-level enhancement because of supervisory job position, "[r]egardless of [defendant's] exact role in the conspiracy," based on District Court's conclusory assertion at sentencing); *United States v. Duncan,* 42 F.3d 97, 105–06 (2d Cir.1994) (business's top officer was properly assessed four-level enhancement because he knew of and implicitly approved corruption over which he had control, even though he may have been "merely a passive participant").

The District Court's findings in this case satisfy the "specific findings of fact" requirement of U.S.S.G. § 3B1.1 because the Court made a specific determination as to the exact conspiracies in which Persico played a supervisory role.

## IV. Zambardi's Plea Withdrawal

■ Following the Government's disclosure of Scarpa's role and DeVecchio's misconduct, Zambardi moved to withdraw his plea, arguing that he would not have pled guilty if he had known of this impeachment material. He contends that the District Court exceeded its discretion under Fed. R.Crim.P. 32(e) by not allowing him to withdraw his guilty plea. His argument is without merit, particularly in light of this Court's decision in *Orena,* 145 F.3d at 560–61.

■ Rule 32(e) allows a defendant to withdraw a guilty plea before sentencing for "any fair and just reason." The Government's obligation to disclose *Brady* materials is pertinent to the accused's decision to plead guilty; the defendant is entitled to make that decision with full awareness of favorable (exculpatory and impeachment) evidence known to the Government. *See United States v. Avellino,* 136 F.3d 249, 255 (2d Cir.), *reh'g denied,* 136 F.3d 262 (2d Cir.1998). In the context of withdrawal of a guilty plea because of newly disclosed Government information, "evidence is considered material where 'there is a reasonable probability that but for the failure to produce such informa-

---

Probation Department considered each of the conspiracies for which the District Court ultimately sentenced Persico, and either concluded that he had minimal participation in each of

them, *see* U.S.S.G. § 3B1.2, or recommended no adjustment, finding that, although present and active, Persico played no supervisory role.

tion the defendant would not have entered the plea but instead would have insisted on going to trial.'" *Id.* at 256 (quoting *Tate v. Wood,* 963 F.2d 20, 24 (2d Cir.1992)). This test is objective, involving an inquiry into the likely persuasiveness of the undisclosed information. *See id.*

To support his claim that he would have gone to trial if he had known about the Scarpa/DeVecchio information, Zambardi combines the following arguments: (1) in trials where the Scarpa disclosures have been admitted, involving some of the same crimes and co-defendants of Zambardi, many Colombo family defendants have been acquitted; (2) other judges of the Eastern District have found the Scarpa disclosures relevant and material to different Colombo family defendants;[4] (3) when judges have so found, the Government has sometimes decided not to use cooperating witnesses who might be impeached with that material, and who were the principal witnesses able to implicate Zambardi; (4) the evidence against Zambardi presented at the instant trial should not be counted, because, having pled guilty, he had no opportunity to cross-examine; and (5) the disclosed information is so shocking that it would have influenced a jury.

Zambardi's argument rests on a sequence of hypothetical events all of which are highly speculative and most unlikely to have occurred. He predicts that if he had gone to trial, the Scarpa/ DeVecchio information would have been admitted into evidence, that evidence would have significantly reduced the chances of his conviction, and, if the information had been disclosed before his plea, he would have had sufficient confidence in the admissibility of the information and its likely effect on the jury to go to trial and risk exposure to a life sentence instead of the 15 years specified in his plea bargain.

As to possible admissibility, the District Court properly analyzed the evidence as it related to Zambardi's case, and found that the impeachment evidence was not material. *See Orena,* 145 F.3d at 551 (finding that

same evidence was not material as to Zambardi's co-defendants at his trial); *Malpeso,* 115 F.3d at 163 (noting tendency of Scarpa/DeVecchio evidence in different trial to distract and confuse jury with evidence more prejudicial than probative). If the evidence would not have been admissible, it obviously would not have had any influence on the jury. Even if admissible, it is highly doubtful that the information would have lessened the likelihood of Zambardi's conviction in light of the substantial evidence against him. The acquittals of some defendants in other cases demonstrates the relative weakness of the evidence against those defendants, rather than any mitigating force of the Scarpa–DeVecchio information.

The District Court properly assessed Zambardi's motion in light of the strength of the evidence against him, as demonstrated at the Persico trial, and our review must consider this assessment: As the Supreme Court has cautioned:

> The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.

*United States v. Bagley,* 473 U.S. 667, 683, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Furthermore, the Supreme Court has more recently held that the impact of suppressed evidence should be considered "collectively, not item by item," considering the availability of other exculpatory or impeachment evidence. *Kyles v. Whitley,* 514 U.S. 419, 436–37, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

Finally, the claim that Zambardi would have risked exposure to a life sentence, rather than 15 years, on a prediction that the disclosed information would be both admissible and significantly helpful is a totally unlikely speculation. Chief Judge Sifton did

---

4. For example, Judge Korman admitted the Scarpa/DeVecchio evidence in *United States v. Orena,* 876 F.Supp. 20 (E.D.N.Y.1995) (involving different defendants from the case recently reversed), and Judge Nickerson admitted the Scarpa disclosures without the DeVecchio misconduct in *United States v. Cutolo,* 868 F.Supp. 39, 41 (E.D.N.Y.1994).

not exceed his discretion by denying Zambardi's motion to withdraw his plea.

### V. Fusco's Purported "Plea Withdrawal"

 The Government and Fusco disagree on what relief Fusco sought in the District Court concerning his plea. Fusco contends that he sought to withdraw his plea. The Government contends that Fusco sought only a departure from the sentence that had been agreed upon in the plea bargain. We conclude that Fusco was not moving for a plea withdrawal, but only for a more lenient sentence.

The plea and the plea agreement had not yet been accepted when Fusco made his application. A Rule 32(e) plea withdrawal motion was technically not available. What Fusco sought in reality was to retain the benefits of his plea agreement, urge its acceptance, and simultaneously renegotiate the length of the previously bargained-for sentence. The task for Chief Judge Sifton was to consider whether to accept the plea agreement and the plea, and he properly turned to that task. In response to Fusco's argument, Chief Judge Sifton stated:

> [T]he only reason I would reject this plea is because, given the guidelines that exist, I feel it is appropriate to depart from those guidelines in imposing a more lenient sentence. And if I reach that conclusion, then I will reject the plea agreement.

However, Chief Judge Sifton declined to make a departure and therefore accepted the plea and imposed sentence. Moreover, it would have made no sense for Fusco to withdraw his plea, since, in light of the Government's opposition to a departure downward from the agreed-upon 14-year sentence, he would have faced trial on all five counts of the indictment.

Thus, the only real issue raised is whether the trial court applied the correct standard to Fusco's request for a "departure" from the bargained-for sentence of the plea agreement. Even if we assume, for the argument, that the denial of a sentence departure, urged as a reason for modifying a plea agreement, may be reviewed on appeal, Chief Judge Sifton acted well within his discretion. The standards for a downward departure on medical grounds are strict, *see* U.S.S.G. § 5H1.4; *United States v. Altman*, 48 F.3d 96, 104 (2d Cir.1995) (holding that "extraordinary physical impairment" required by guideline for downward departure requires medical conditions that Bureau of Prisons is unable to accommodate). The plea agreement was properly accepted, and the sentence properly imposed.

### Conclusion

The judgments of the District Court and the denial of post-judgment motions are affirmed in all respects.