**UNITED STATES of America**

**v.**

**Brian DANZI, Defendant.**

**Criminal No. 3:07cr305 (MRK).**

United States District Court,
D. Connecticut.

July 8, 2010.

H. Gordon Hall, John H. Durham, Peter D. Markle, U.S. Attorney's Office, New Haven, CT, Harold H. Chen, U.S. Attorney's Office, Bridgeport, CT, for United States of America.

Frank J. Riccio, II, Law Offices of Frank J. Riccio, Frank J. Riccio, Bridgeport, CT, Paul F. Thomas, Federal Public Defender's Office, New Haven, CT, for Defendant.

## *RULING AND ORDER*

MARK R. KRAVITZ, District Judge.

Pending before the Court is Defendant Brian Danzi's Motion to Withdraw Guilty Plea [doc. # 245]. Mr. Danzi requests leave of the Court to withdraw his May 5, 2009 plea of guilty to a charge of possession with the intent to distribute and the distribution of marijuana, in violation of 21 U.S.C. § 841(a); and a charge of conspiracy to possess with the intent to distribute marijuana, in violation of 21 U.S.C. §§ 841 and 846. *See* Tr. of Change of Plea H'ring [doc. # 252]; Plea Agreement [doc. # 153]. Mr. Danzi argues that his guilty plea was not the product of a "voluntary and intelligent" choice because it was obtained as a result of a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and, moreover, that the *Brady* violation provides him with a "fair and just reason for requesting the withdrawal" of his guilty plea under Rule 11(d)(2)(B) of the *Federal Rules of Criminal Procedure. See* Def.'s Mem. in Supp. of Mot. to Withdraw Guilty Plea ("Def.'s Mem.") [doc. # 246]; Def.'s Supplemental Mem. in Supp. of Mot. to Withdraw Guilty Plea ("Def.'s Supp. Mem.") [doc. # 253].

While the Court agrees that there was, indeed, a *Brady* violation in this case—a serious matter for which the Government has no excuse—Mr. Danzi has neither met the standard of Rule 11(d)(2)(B) nor demonstrated "a reasonable probability"

that had the Government produced this evidence to him earlier, "he would not have entered the plea but instead would have insisted on going to trial." *United States v. Avellino,* 136 F.3d 249, 255 (2d Cir.1998) (quoting *Tate v. Wood,* 963 F.2d 20, 24 (2d Cir.1992)). Accordingly, and as explained below, Mr. Danzi's Motion to Withdraw Guilty Plea [doc. # 245] is DENIED.

## I.

Brian Danzi and five others (including his brother, Michael Danzi) were indicted on December 20, 2007 for their suspected participation in a marijuana distribution and money-laundering operation. *See* Indictment [doc. # 16]. Brian Danzi was charged in Count One with conspiracy to possess with intent to distribute and to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vii), and 846; and in Count Two, with the possession of an unspecified quantity of marijuana with the intent to distribute and the distribution thereof, in violation of 21 U.S.C. §§ 841(a)(1)and 841(b)(1)(D). *See id.* at 1–2.

## A.

More than sixteen months later, on May 5, 2009—and on the day the Court was to select the jury for his trial—Mr. Danzi accepted the Government's offer to plead guilty to possession with intent to distribute and the distribution of an unspecified quantity of marijuana, in violation of 21 U.S.C. § 841(a); and to a one-count substitute Information [doc. # 151] charging him with conspiracy to possess with intent to distribute an unspecified quantity of marijuana, in violation of 21 U.S.C. §§ 841 and 846. *See* B. Danzi Plea Agreement [doc. # 153]. At the same time, Brian Danzi's

brother, Michael Danzi, also agreed to plead guilty, but also could not agree with the Government as to the quantity of marijuana attributable to him by virtue of his participation in the conspiracy. *See* M. Danzi Plea Agreement [doc. # 158].

At the change of plea hearing, which was for both of the Danzis, Brian Danzi was represented by his court-appointed attorney, Bruce Koffsky. Both Defendants were placed under oath, and the Court conducted a comprehensive Rule 11 hearing that lasted an hour and twelve minutes. *See* Tr. of Change of Plea H'ring [doc. # 252]. At the beginning of the hearing, Brian Danzi—unprompted, and apparently against the advice of counsel [1] —stated that while he was "happy with the plea, . . . it would have been fair to give us a week or two weeks of thinking time." *Id.* at 4:24—5:1. The Court explained to Mr. Danzi that it played no role in plea negotiations, and that its role, rather, was:

> to make sure today . . . that you understand what you are doing, and that you understand your rights, that you understand the consequences of pleading guilty, and that you are choosing to plead guilty freely and voluntarily and because you are in fact guilty of these charges. That's my task today. And so I need you to listen carefully so I can make those determinations. I'm going to have to make findings about those issues at the end, okay?

*Id.* at 5:11–18. Mr. Danzi replied that he understood and indicated that he was prepared to plead guilty. *See id.* at 5:19–22 ("Yes, your Honor. We are going to plead guilty . . . .").

Thereafter, Mr. Danzi confirmed that he knew that he was under oath, *see id.* at 6:22, and was advised of his rights, *see id.*

---

**1.** The Court does not suggest that Mr. Danzi's statement was improper in any way; it is mentioned here only to provide appropriate context for his decision to plead guilty.

at 7–8. Upon questioning by the Court, Mr. Danzi stated that he was not under the influence of any medication or intoxicating substance, *see id.* at 9–11, and that his mind was "[v]ery clear," *id.* at 11:3. Mr. Danzi confirmed that he had read the Indictment and the Information filed against him, *see id.* at 13:5–8, and that he had the opportunity to discuss the charges against him with his attorney, *see id.* at 13:10–12. Mr. Danzi also stated that he was satisfied with the legal representation that he had received to date. *See id.* at 13:14–17.

The Court reviewed the rights Mr. Danzi would be waiving by pleading guilty, the statutory penalties, and his plea agreement with the Government. The Court explained that among the rights that Mr. Danzi would be waiving would be his right to remain silent and not to incriminate himself, explaining that:

> [B]efore I can accept your plea, I'm going to ask you to tell me, in your very own words, what you did that you think makes you guilty of this offense, and you will have to do so under oath and by doing so, you will be waiving your privilege against self-incrimination.

*Id.* at 21:25—22:6. Mr. Danzi responded that he fully understood the rights he would be giving up, including the right against self-incrimination, as well as the consequences of pleading guilty and the commitments in the plea agreement. *See id.* at 15–35. Mr. Danzi also confirmed that he entered into the plea agreement knowingly and intentionally. *See id.* at 41:11–13.

The Court then went over the elements of the offenses to which Mr. Danzi was pleading guilty, which Mr. Danzi indicated that he understood. *See id.* at 38–40. The Court asked Mr. Danzi to describe in his own words what he had done that made him think he was guilty of the offenses charged. As to the charge of conspiracy, Mr. Danzi stated that between 2005 and 2007, he and his brother "had an agreement to sell marijuana and I did sell marijuana to an individual for sale, and [I] plead guilty to that."[2] *Id.* at 41:3–7. On the charge of possession with the intent to distribute and to distribute marijuana, Mr. Danzi stated: "[W]hen I had in my possession, I did sell—when I had it in my possession, I did sell a little, you know, some marijuana to an individual, you know, and I'm guilty for that." *Id.* at 41:15–18. Mr. Danzi also confirmed that he intended to and did, in fact, distribute the marijuana to a third party. *See id.* at 41:23–25.

At that point, the Court asked the Assistant United States Attorney to describe the evidence that the Government would put on if Brian Danzi and Michael Danzi had decided to proceed to trial. Among other items of evidence, the Assistant United States Attorney described a marijuana purchase made from Brian Danzi by a confidential informant under the supervision of the Drug Enforcement Agency (DEA); the seizure from Brian Danzi's home of packaging materials, paraphernalia, and other items used in the sale of marijuana; statements of co-conspirators implicating Brian Danzi in the conspiracy; and recorded conversations involving Brian Danzi (and others) in which he discussed the marijuana conspiracy. *See id.* at 43–48. When the prosecutor had finished, the Court asked Brian Danzi if he disagreed with anything the prosecutor had said. Mr. Danzi stated that he had not conspired with all of the individuals mentioned by the prosecutor; however, Mr. Danzi stated that he *did* conspire to

---

**2.** Michael Danzi stated substantially the same thing, saying: "On 2005 to 2007, I am guilty of having an agreement with my brother to distribute marijuana." *Id.* at 42:4–6.

sell marijuana with his brother and another co-defendant, George Tsellos. *See id.* at 50:20–24. Mr. Danzi expressed no other disagreement with the statements of the Assistant United States Attorney.

At the conclusion of the Rule 11 hearing, the Court asked Mr. Danzi if he wanted to plead guilty because he was in fact guilty of the offense charged, and whether he had chosen to plead guilty freely and voluntarily. Mr. Danzi responded in the affirmative. *See id.* at 51–53. Neither counsel knowing of any reason why the Court should not accept the plea, the Court found that Mr. Danzi was competent; that he understood the nature of the charges; that he understood the rights he would be waiving by pleading guilty; that he understood the consequences of pleading guilty; that he was pleading guilty because he was in fact guilty of the offense charged; and that his guilty plea was a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense. *See id.* at 53–54. The Court therefore accepted Mr. Danzi's guilty plea and made a finding that he was guilty of Count One of the Information [doc. # 151] and Count Two of the Indictment [doc. # 16].

### B.

Since the Government was unable to reach agreement with either Brian Danzi or Michael Danzi regarding the quantity of marijuana to be used in calculating the applicable advisory Sentencing Guidelines imprisonment ranges, the Court held an evidentiary hearing to aid in that determination. *See generally Gall v. United States,* 552 U.S. 38, 49–50, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). The first day of the evidentiary hearing was held on August 13, 2009; the hearing was continued to September 23, 2009 to permit the parties additional time to secure witnesses and documentary evidence. In their briefs and at throughout the hearing, both Brian Danzi and Michael Danzi argued that the appropriate quantity of marijuana attributable to each of them was between 20 and 40 kilograms. Upon consideration of the evidence regarding the scope of the brothers' participation in the conspiracy—including surveillance; wiretaps; controlled purchases; statements of confidential informants and co-conspirators; and the unexplained wealth of both brothers—the Court disagreed, finding by a preponderance of the evidence that both Brian Danzi and Michael Danzi were responsible for at least 100 kilograms of marijuana. *See* Ruling and Order dated Oct. 9, 2009 [doc. # 202]; *see also United States v. Jones,* 531 F.3d 163, 175 (2d Cir.2008); *United States v. Wallace,* 284 Fed.Appx. 837, 839–40 (2d Cir.2008) (summary order).

### C.

Two months later, on December 8, 2009, the Court sentenced Michael Danzi to a term of imprisonment of 48 months, to be followed by a 3–year term of supervised release, as well as a $200 special assessment. *See* Judgment as to M. Danzi [doc. # 219]. Brian Danzi was scheduled to be sentenced that same day, but less than a week earlier, on December 3, Brian Danzi's attorney, Mr. Koffsky, moved to withdraw his appearance in light of Mr. Danzi's decision to replace him with retained counsel, Stephan Seeger. *See* Mot. to Withdraw [doc. # 210]. The following day, Mr. Seeger, on behalf of Mr. Danzi, requested that Mr. Danzi's sentencing be continued; Mr. Seeger indicated that he likely would be filing a motion to vacate Mr. Danzi's plea. *See* Def.'s Mot. to Continue Sentencing [doc. # 211]. The motion to continue Mr. Danzi's sentencing was granted, *see* Order [doc. # 213], as was a second motion to continue sentencing [doc. # 240].

On March 19, 2010, Mr. Danzi moved to vacate his guilty plea on two overlapping grounds, both based on the Government's failure to produce to Mr. Danzi certain allegedly-exculpatory discovery material prior to the entry of his guilty plea—a violation of *Brady*. Mr. Danzi argues, first, that the Government's *Brady* violation means that his guilty plea was not the product of a "voluntary and intelligent" choice; and second, that it constitutes a "fair and just" reason under Rule 11(d)(2)(B) of the *Federal Rules of Criminal Procedure* for the withdrawal of his plea. *See* Def.'s Mot. to Withdraw Plea of Guilty [doc. # 245]; Def.'s Mem. [doc. # 246]; Def.'s Supp. Mem. [doc. # 253].

The Court will consider each of Mr. Danzi's arguments for vacating his guilty plea in turn.

## II.

■ It is axiomatic that "[a] guilty plea must be a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Wilson v. McGinnis*, 413 F.3d 196, 198–99 (2d Cir. 2005) (citation and quotation marks omitted). A "voluntary and intelligent" guilty plea is one that the defendant enters "with full awareness of its direct consequences." *Id.* at 199 (citation and quotation marks omitted). "Although a guilty plea is generally considered valid so long as the plea was intelligent and voluntary, the validity of the plea must be reassessed if it resulted from impermissible conduct by state agents." *Avellino*, 136 F.3d at 255 (citations and quotation marks omitted). One type of "impermissible conduct" that could render a guilty plea involuntary is the prosecutor's failure to adhere to the dictates of *Brady*. *See id.* ("[W]here prosecutors have withheld favorable material evidence, 'even a guilty plea that was knowing and intelligent may be vulnerable to challenge.'") (quoting *Miller v. Angliker*, 848 F.2d 1312, 1320 (2d Cir.1988)); *Tate*, 963 F.2d at 24–25.

■ *Brady* and its progeny hold that "[t]o the extent that the prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant." *Avellino*, 136 F.3d at 255; *see also Brady*, 373 U.S. at 87, 83 S.Ct. 1194 (holding that the prosecution's suppression of evidence favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"); *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 161–62 (2d Cir. 2008). The Second Circuit has held that the Government's obligation to disclose so-called "*Brady* material" attaches "not only to an accused's preparation for trial but also to his determination of whether or not to plead guilty," for defendants are "entitled to make that decision with full awareness of favorable material evidence known to the government." *Avellino*, 136 F.3d at 255; *see also United States v. Coppa*, 267 F.3d 132, 144 (2d Cir.2001) (requiring the Government to provide *Brady* material "in time for its effective use").[3]

■ That said, "[t]he *Brady* obligation extends only to *material* evidence that is known to the prosecutor." *Avellino*, 136 F.3d at 255 (emphasis added). Generally speaking, "[f]avorable evidence

---

**3.** The District of Connecticut Local Criminal Rules also require the Government to produce to the defense within fourteen days from the date of arraignment, "[a]ll information known to the government which may be favorable to the defendant on the issues of guilt or punishment within the scope of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)." District of Connecticut Criminal Appendix, Standing Order on Discovery ¶ A(11).

is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 256 (quoting *Kyles v. Whitley,* 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). "In the context of an attack on the validity of a plea," the Second Circuit has advised that:

> [E]vidence is considered material where there is a reasonable probability that but for the failure to produce such information the defendant would not have entered the plea but instead would have insisted on going to trial. Assessment of that question involves an objective inquiry that asks not what a particular defendant would do but rather what is the likely persuasiveness of the withheld information.

*Id.* (citations and quotation marks omitted); *see also Coppa,* 267 F.3d 132, 144 ("There is no *Brady* violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial or at a plea proceeding.") (citation omitted).

Mr. Danzi's *Brady* claim relates to a statement made by co-conspirator and co-defendant George Tsellos to agents of the DEA during a proffer session. The Court will discuss Mr. Tsellos' statements at length below, but to summarize, at the beginning of the first of his three proffer sessions, Mr. Tsellos indicated that Brian Danzi was not involved in the drug conspiracy at issue—a statement that Mr. Tsellos retracted (forcefully, and in great detail) almost immediately after making it.

In opposing Mr. Danzi's attempt to withdraw his plea of guilty, the Government makes two arguments—one on the basis of the allegedly-exculpatory evidence itself and the other based on the state of the law. *See* Government's Mem. in Opp'n to Mot. to Withdraw Guilty Plea ("Gov. Mem.") [doc. # 249]; Government's Supplemental Mem. in Opp'n to Mot. to Withdraw Guilty Plea ("Gov. Supp. Mem.") [doc. # 254]. First, the Government argues that Mr. Tsellos' statement was not material, in that even if it had been disclosed, there is not a reasonable probability that it would have changed the outcome of this case. *See Avellino,* 136 F.3d at 255. Second, the Government argues that pre-plea disclosure of the evidence at issue here is not required under *United States v. Ruiz,* 536 U.S. 622, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002). The Court will take these arguments in the opposite order.

### A.

In *Ruiz,* the Supreme Court held that "the Constitution does not require the Government to disclose material *impeachment* evidence prior to entering a plea agreement with a criminal defendant." *Id.* at 633, 122 S.Ct. 2450 (emphasis added). The Government makes two arguments for the application of *Ruiz* to this case: first, that "at most, Tsellos' initial comment that [Brian Danzi] was not involved in drug dealing could be useful only to impeach Tsellos in the unlikely event he were called as a government witness to testify about [Brian Danzi's] extensive history of dealing in large quantities of marijuana," Gov. Supp. Mem. [doc. # 254] at 2–3; and second, that even if Mr. Tsellos' comment is interpreted as more than merely impeachment material—the only category of evidence directly addressed by *Ruiz*—court decisions interpreting *Ruiz* to cover "exculpatory information as well as impeachment information are more persuasive" than those holding to the contrary, *id.* at 3; *see also id.* at 18–22.

■ To begin, the Court disagrees that the statement at issue was merely impeachment material. While the line divid-

ing impeachment material from substantive exculpatory material may be a difficult one to draw at times—and, of course, the same piece of evidence may serve both purposes in appropriate circumstances—Mr. Tsellos' statement that Brian Danzi "has nothing to do with drugs" is plainly the type of evidence that "go[es] to the heart of the defendant's guilt or innocence." *Avellino*, 136 F.3d at 255. It is therefore properly considered exculpatory. *See id.* (distinguishing exculpatory from impeachment material, and defining the latter as evidence "having the potential to alter the jury's assessment of the credibility of a significant prosecution witness").

■ The Government's argument regarding *Ruiz* is a somewhat trickier issue. As the Government concedes, the Second Circuit has not yet had an opportunity to consider whether *Ruiz*'s reasoning—that impeachment material need not be disclosed to a criminal defendant pre-plea—also encompasses exculpatory material. *See* Gov. Supp. Mem. [doc. # 254] at 18. The Government also readily admits that the Second Circuit's pre-*Ruiz* jurisprudence requires the disclosure of exculpatory material before guilty pleas. *See id.; Coppa*, 267 F.3d at 144; *United States v. Persico*, 164 F.3d 796, 804–05 (2d Cir. 1999); *Avellino*, 136 F.3d at 255.

Nonetheless, the Government urges the Court to follow non-binding precedent from other Circuits—in particular, the Fifth Circuit—that have interpreted *Ruiz* to permit the pre-plea non-disclosure of both impeachment and exculpatory information. *See United States v. Conroy*, 567 F.3d 174, 179 (5th Cir.2009) (rejecting the argument that "the limitation of the Court's discussion [in *Ruiz* ] to impeachment evidence implies that exculpatory evidence is different and must be turned over before entry of a plea" because "*Ruiz* never makes such a distinction nor can this

proposition be implied from its discussion."); *see also United States v. Moussaoui*, 591 F.3d 263, 287–88 (4th Cir.2010) (discussing the issue in *dicta*, but leaving it unresolved because the prosecutor had not suppressed exculpatory evidence); *but see McCann v. Mangialardi*, 337 F.3d 782, 788 (7th Cir.2003) (stating, in *dicta*, that "*Ruiz* indicates a significant distinction between impeachment information and exculpatory evidence of actual innocence. Given this distinction, it is highly likely that the Supreme Court would find a violation of the Due Process Clause if prosecutors or other relevant government actors have knowledge of a criminal defendant's factual innocence but fail to disclose such information to a defendant before he enters into a guilty plea."); *United States v. Ohiri*, 133 Fed.Appx. 555, 562 (10th Cir.2005) (unpublished) (reversing a district court's dismissal of a federal habeas petition and holding that the failure to provide pre-plea exculpatory material could violate due process).

The Court declines the Government's invitation to hold that *Ruiz* applies to exculpatory as well as impeachment material. The Court does so for three reasons. First, as the Government points out, the Second Circuit has never overturned the holdings of *Coppa*, 267 F.3d at 144; *Persico*, 164 F.3d at 804–05; and *Avellino*, 136 F.3d at 255; among other cases, all of which require the pre-plea disclosure of exculpatory material to criminal defendants. That is the law of this Circuit, and the Court is bound by those decisions unless and until the Second Circuit reaches a contrary conclusion.

Second, the Government's argument that it was not required to disclose the exculpatory material is undermined by its own repeated (and correct) admissions that it should have provided Mr. Danzi with the exculpatory material before he pleaded guilty. *See, e.g.,* Gov. Supp. Mem. [doc.

# 254] at 1–2, 22. The United States Attorney's Office for the District of Connecticut is bound by controlling Second Circuit precedent, including those cases mentioned above, requiring the disclosure of all exculpatory *Brady* material prior to the entry of a guilty plea. Indeed, the Court's own Local Criminal Rules require such disclosures. *See* District of Connecticut Criminal Appendix, Standing Order on Discovery ¶ A(11). Although the Court does not ascribe bad faith to the Government in this case, and while it appreciates its candor in conceding that it should have provided this material earlier, there is no excuse for a *Brady* violation, as the Government well knows. *See Brady,* 373 U.S. at 87, 83 S.Ct. 1194.

Third, whether *Ruiz* applies to exculpatory material or not would not alter the resolution of Mr. Danzi's motion to withdraw his guilty plea, as the Court finds that the non-disclosed *Brady* matter is not material to Mr. Danzi's guilty plea. *See Avellino,* 136 F.3d at 255; *Tate,* 963 F.2d at 24; *Miller,* 848 F.2d at 1322.

### B.

■ Mr. Danzi's *Brady* claim is premised on one sentence in a 13–page report prepared on November 14, 2007 by agents of the DEA. This report (the "Nov. 14, 2007 Tsellos' Report") recounts statements made by co-conspirator and co-defendant George Tsellos to DEA agents during two proffer sessions held on November 11 and November 12, 2007. *See* Nov. 14, 2007 Tsellos' Report [doc. # 197]; Ruling and Order dated Oct. 9, 2009 [doc. # 202] at 6–7 (discussing parts of the Tsellos' report). This report, and another dated November 27, 2007 (the "Nov. 27, 2007 Tsellos' Report") that recounts Mr. Tsellos third and final proffer, were first disclosed to Mr. Danzi on August 12, 2009 in connection with the evidentiary hearing on the drug quantity attributable to him and his brother for purposes of sentencing. *See* Ex. C to Def.'s Mem. [doc. # 246].

The first 9 paragraphs of the 44–paragraph report describe how Mr. Tsellos became involved in drug trafficking and money laundering, and do not mention Mr. Danzi. In the tenth paragraph, however, Mr. Tsellos makes the following statement:

> TSELLOS stated that he met Brian DANZI at a casino and they are both gamblers. TSELLOS and B. DANZI became good friends and bonded. *TSELLOS insisted that B. DANZI has nothing to do with drugs and is just a friend.* TSELLOS stated that he loaned B. DANZI about $20,000 to use to the purchase of his home, but the $20,000 was TSELLOS's own money that he won gambling, not drug money.

Nov. 14, 2007 Tsellos' Report [doc. # 197] ¶ 10 (emphasis added). The italicized sentence is the basis of Mr. Danzi's *Brady* claim. While that statement does seem to exculpate Mr. Danzi from the drug conspiracy—albeit in very general terms—in the subsequent paragraphs of the report, Mr. Tsellos proceeds to explain in great detail the degree to which Brian Danzi actually *was* involved in the drug conspiracy.

For example, four lines later, in paragraph 12, Mr. Tsellos makes the following statement:

> TSELLOS stated that B. DANZI was unable to pay back the $20,000 TSELLOS had loaned him. TSELLOS offered to get some marijuana to B. DANZI so that B. DANZI could see [sic] the marijuana and pay off his debt to TSELLOS. TSELLOS related that it was 18 pounds of weed but B. DANZI had trouble selling it, which is the reason for the recent fight between TSELLOS and B. DANZI.

*Id.* ¶ 12. In next two paragraphs, Mr. Tsellos indicates that he stored the proceeds of the drug conspiracy at Brian Danzi's home:

TSELLOS went on to state that he has used B. DANZI's new house in Ridgefield to store money. The storage location is a secret and only B. DANZI, M. DANZI, and TSELLOS knew where it is. TSELLOS stated that the stash location is inside and underneath a fish tank stand which is located in the garage area, opposite the four wheelers/ATV's which are stored in the garage.

TSELLOS stated that the money that was seized from his brother's cheese truck was originally stored at B. DANZI's Ridgefield house.

*Id.* ¶¶ 13–14.

The day after his first proffer session with the DEA agents, Mr. Tsellos requested to speak with them again, *see id.* ¶ 22, which he did later that same day. Mr. Tsellos began the second proffer session, on November 12, 2007, by stating that "many of the things he said yesterday were not completely truthful." *Id.* ¶ 24. After explaining in greater detail the money-smuggling operation, Mr. Tsellos made the following statement with regard to his relationship with Brian Danzi:

TSELLOS stated that he met Brian DANZI a few year ago when he was directed to deliver a duffle bag of marijuana to DANZI by [Person # 1] at the restaurant near a hotel off Exit 6, I95 in Stamford, Ct. TSELLOS stated that B. DANZI was dealing with [Person # 1] before TSELLOS was. TSELLOS knew of B. DANZI trying to cross the border into Canada years ago but he had problems because he had a friend with him who owed 'tickets' (possibly traffic tickets) so they were turned away. After TSELLOS made the delivery, TSELLOS and B. DANZI became friends. For the past two years, TSELLOS stated that he has received 30–35 pounds of Canadian marijuana for B. DANZI. This marijuana is delivered directly to TSELLOS, usually from an unknown person. TSELLOS then gives the marijuana to B. DANZI. Within a few days, B. DANZI gives TSELLOS the cash to pay for the marijuana which usually totaled $70,000 to $80,000 and TSELLOS smuggled the money back to Canada. TSELLOS stated that he always used MOUNTAIN BOY [4] to get B. DANZI's money back to Canada until MOUNTAIN BOY got caught and set him up. TSELLOS stated that B. DANZI also has a marijuana connection on the west coast, but TSELLOS does not know who it is. B. DANZI was supposed to give TSELLOS a sample to give to [Person # 2], but B. DANZI never gave the sample to TSELLOS. TSELLOS stated that he had contacted [Person # 2] and asked him if he was interested in a sample of the marijuana but never delivered because B. DANZI never carne through.

*Id.* ¶ 36.

Mr. Tsellos also described how he had received a shipment of 80 pounds of marijuana the week before. After Mr. Tsellos sold 60 pounds to the person identified above as "Person # 2" for $125,000, he gave Brian Danzi the remainder for him to sell. *See id.* ¶ 40. Mr. Tsellos told the DEA agents that he was being pressured by his suppliers to sell the drugs quickly due to cash-flow problems caused by the

---

**4.** "Mountain Boy" is a reference to co-defendant Elias Fortier–Kaeslin. *See* Indictment [doc. # 16].

Government's recent seizures of money from Mr. Tsellos' Canada-bound couriers, *see id.* ¶ 42; Mr. Tsellos, therefore, pressed Brian Danzi to sell his 20 pounds quickly:

> As a result, TSELLOS demanded B. DANZI to sell the 20 pounds of marijuana quickly so he could combine that money with [Person # 2's] $125,000 and send it all back to Canada with his brother's cheese truck. TSELLOS stated that B. DANZI has a guy they call [Person # 3] who [fits a certain description] who takes most of B. DANZI's marijuana when it comes in. B. DANZI stated that guy did not want it because of low quality. TSELLOS stated that [Person # 3] lives in [a particular area]. B. DANZI was able to only sell some of the marijuana, so a few days later, TSELLOS and M. DANZI went to B. DANZI's house in Ridgefield where the money was secretly kept and took it all. TSELLOS wrapped the money and delivered it to his brother, Michael TSELLOS, at the Sloatsburg Rest Area in New York to get it back to [Person # 1] in Canada.

*Id.* ¶ 43.

The November 27, 2007 Tsellos' Report, which describes Mr. Tsellos' proffer session on November 26, 2007, is largely duplicative of what has already been discussed. Mr. Tsellos stated that he met Brian Danzi at least two years prior to when Mr. Danzi had given him $60,000 to smuggle to Canada. *See* Nov. 27, 2007 Tsellos' Report [doc. # 197] ¶ 4. Mr. Tsellos reiterated, among other things, that "he received a shipment of 30–35 pounds of marijuana that was destined for B. DANZI each month," *id.* ¶ 6, which Brian Danzi and Michael Danzi would sell to third parties, *see id.* ¶ 7.

 In arguing that the *Brady* violation here was material, Brian Danzi at-

tempts to isolate Mr. Tsellos' singular and somewhat ambiguous statement that Mr. Danzi "has nothing to do with drugs." This he cannot do. Instead, "the impact of suppressed evidence should be considered 'collectively, not item by item,' considering the availability of other exculpatory or impeachment evidence." *Persico,* 164 F.3d at 805 (quoting *Kyles v. Whitley,* 514 U.S. 419, 436–37, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). To prove that the *Brady* violation was material, Mr. Danzi must demonstrate that "there is a reasonable probability that but for the failure to produce" the November 14, 2007 Tsellos' Report, he "would not have entered the plea but instead would have insisted on going to trial." *Persico,* 164 F.3d at 804–05; *see also United States v. Longo,* 16 Fed.Appx. 29, 34 (2d Cir.2001) (summary order). "Assessment of that question involves an objective inquiry that asks not what a particular defendant would do but rather what is the likely persuasiveness of the withheld information." *Avellino,* 136 F.3d at 249 (internal quotations omitted).

Mr. Danzi cannot show any such "reasonable probability." In fact, when taken as a whole, and as detailed above, the November 14, 2007 Tsellos' Report is far more *damaging* to Mr. Danzi than it is helpful; its "likely persuasiveness"—measured from an objective standard—is slim to none. And yet Mr. Danzi would have the Court believe that had he received this single sentence from a wholly damaging report earlier, he would have chosen to go to trial instead of pleading guilty. The Court cannot fathom how that could actually be the case, and Mr. Danzi offers nothing other than his bald assertion to support his leap of logic. *See Persico,* 164 F.3d at 805 (rejecting the defendant's argument that withheld information was material, thereby justifying the withdrawal of his plea, because his argument "rest[ed] on

a sequence of hypothetical events all of which are highly speculative and most unlikely to have occurred."); *Charnock v. Herbert*, 60 F.Supp.2d 91, 102 (W.D.N.Y. 1999) ("It is a leap of logic to infer that, had the Petitioner known of such evidence prior to his plea, he would have declined the prosecutor's offer to dismiss [three] charges in exchange for his plea of guilty to [other] charges, thereby choosing to proceed to trial on all of the pending charges, and possibly face a longer prison sentence.").

Moreover, it is difficult to imagine what good Mr. Danzi could have possibly done with the statements Mr. Tsellos made to the DEA agents. Mr. Tsellos was not on the Government's witness list, *see* Government's Proposed *Voir Dire* Questions [doc. # 146], and while Mr. Danzi could have called him to testify, it is quite possible that Mr. Tsellos would have invoked his Fifth Amendment right against self-incrimination. *See Persico*, 164 F.3d at 805 ("If the evidence would not have been admissible, it obviously would not have had any influence on the jury."); *Longo*, 16 Fed.Appx. at 34 (same). Moreover, given how deeply and clearly Mr. Tsellos incriminated Brian Danzi in the drug conspiracy during the balance of his proffer—which was corroborated by Mr. Danzi's admission during the plea colloquy that he had an agreement to distribute marijuana "[w]ith my brother and with George," Tr. of Change of Plea H'ring [doc. # ] at 50:20–24 [5]—the Court is extremely skeptical that Mr. Danzi ever would have called Mr. Tsellos as a witness. *See United States v. Gil*, 297 F.3d 93, 103 (2d Cir.2002) ("Where the evidence against the defen-

dant is ample or overwhelming, the withheld Brady material is less likely to be material than if the evidence of guilt is thin."); *Persico*, 164 F.3d at 805 (rejecting as "totally unlikely speculation" the argument that a criminal defendant would have risked receiving a longer sentence at trial instead of pleading guilty "on a prediction that the disclosed information would be both admissible and significantly helpful").

In sum, since Mr. Danzi has failed to demonstrate that the *Brady* violation here was material, he cannot show that his plea of guilty was not "a voluntary and intelligent choice." *Wilson*, 413 F.3d at 198 (citation omitted); *see Persico*, 164 F.3d at 805; *Avellino*, 136 F.3d at 255; *Tate*, 963 F.2d at 24; *Miller*, 848 F.2d at 1322. Accordingly, Brian Danzi's Motion to Withdraw Guilty Plea [doc. # 245] on that ground is denied.

## III.

The same is true of the second ground on which Mr. Danzi bases his Motion to Withdraw Guilty Plea [doc. # 245]—Rule 11(d)(2)(B) of the *Federal Rules of Criminal Procedure*. Under that Rule, a defendant may withdraw his plea anytime before sentencing if he "can show a fair and just reason for requesting the withdrawal." Fed.R.Crim.P. 11(d)(2)(B). The Second Circuit has explained that while "this standard implies that motions to withdraw prior to sentence should be liberally granted, a defendant who seeks to withdraw his plea bears the burden of satisfying the trial judge that there are valid grounds for withdrawal...." *United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d

---

5. *See United States v. Grzybek*, 283 Fed.Appx. 843, 845 (2d Cir.2008) (summary order) ("It is well established that '[a] criminal defendant's self-inculpatory statements made under oath at this plea allocution carry a strong presumption of verity ... and are generally treated as conclusive in the face of the defendant's later attempt to contradict them.'") (quoting *Adames v. United States*, 171 F.3d 728, 732 (2d Cir.1999) (alterations in original)).

Cir.1992) (citation and quotation marks omitted). The Second Circuit has explained that:

> The standard for withdrawing a guilty plea is stringent because "society has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice."

*United States v. Doe,* 537 F.3d 204, 211 (2d Cir.2008) (quoting *United States v. Maher,* 108 F.3d 1513, 1529 (2d Cir.1997)); *see also United States v. Piris,* 599 F.Supp.2d 205, 210–11 (D.Conn.2009).

 In considering whether a defendant has shown a "fair and just reason" for withdrawing his guilty plea, the trial court should consider, among other factors: "(1) the amount of time that has elapsed between the plea and the motion; (2) whether the defendant has asserted a claim of legal innocence; and (3) whether the government would be prejudiced by a withdrawal of the plea." *Doe,* 537 F.3d at 210; *see also United States v. Couto,* 311 F.3d 179, 185 (2d Cir.2002); *Piris,* 599 F.Supp.2d at 210–11. Moreover, "[w]here a motion to withdraw a plea is premised on involuntariness, the 'defendant must raise a significant question about the voluntariness of the original plea.'" *Doe,* 537 F.3d at 211 (quoting *United States v. Torres,* 129 F.3d 710, 715 (2d Cir.1997)).

 Every factor in the Rule 11(d)(2)(B) analysis weighs against permitting Mr. Danzi to withdraw his guilty plea. The delay here has been significant—and, the Court believes, strategic; Mr. Danzi has not asserted a claim of actual innocence; the Government would be prejudiced by permitting Mr. Danzi to withdraw his plea; and there is every reason to believe that Mr. Danzi's plea was voluntary.

As to the first factor, Mr. Danzi waited a considerable amount of time before deciding that he wanted to withdraw his plea. As previously mentioned, Mr. Danzi received reports of Mr. Tsellos' proffer sessions on August 12, 2009. Yet, the first indication that he gave the Court that he wanted to withdraw his plea was approximately four months later. In the intervening months, the Court held a two-day evidentiary hearing, after which it held (over Mr. Danzi's arguments to the contrary) that, for purposes of sentencing, he is responsible for at least 100 kilograms of marijuana by virtue of his participation in the conspiracy. *See* Ruling and Order [doc. # 202].

This delay is relevant for a number of reasons. For one, the fact that Mr. Danzi waited until after the Court had issued its ruling regarding quantity (even though he had Mr. Tsellos' statements for nearly two months before the Court issued its ruling) strongly suggests that Mr. Danzi was gambling on the Court finding some lesser quantity attributable to him—a gamble that he lost, and then regretted. Lost regrets are not valid reasons for withdrawing a guilty plea. *See United States v. Grimes,* 225 F.3d 254, 259 (2d Cir.2000) ("The fact that a defendant has a change of heart prompted by his reevaluation of either the Government's case against him or the penalty that might be imposed is not a sufficient reason to permit withdrawal of a plea.") (quoting *United States v. Gonzalez,* 970 F.2d 1095, 1100 (2d Cir. 1992)); *see also United States v. Rosen,* 409 F.3d 535, 547 (2d Cir.2005) (affirming a decision to deny a motion to withdraw a guilty plea where the district court found that the defendant's four-month delay in seeking to withdraw his plea was a "strate-

gic maneuver ... plainly contrary to the rationale for plea withdrawal").

As to the second factor, even though the Government is not required to show that it would be prejudiced by Mr. Danzi withdrawing his guilty plea—*see United States v. Cayce*, 319 Fed.Appx. 23, 26 (2d Cir. 2009) (summary order) ("If the movant is unable to carry his burden of showing that a fair and just reason supports the withdrawal of his guilty plea, the district court need not reach the question of prejudice to the government."); *Torres*, 129 F.3d at 715 ("[T]he government need not demonstrate prejudice where the defendant fails to show sufficient grounds to justify withdrawal of the plea.")—it is nonetheless the case that permitting Mr. Danzi to withdraw his plea would prejudice the Government in at least two ways. Allowing Mr. Danzi to withdraw his plea now would mean that the Government's efforts in proving the quantity of marijuana attributable to Mr. Danzi were entirely wasted; and it would mean that the memories of the witnesses the Government would call to prove Mr. Danzi's guilt would have faded by more than 14 months. *See United States v. Lopez*, 385 F.3d 245, 254 (2d Cir.2004) (" 'Prejudice' in the context of plea withdrawal typically refers to depriving the Government of the benefit of its bargain by having the burden of trial preparation suddenly thrust upon it, as well as the potential difficulty to the Government in securing evidence against the defendant that would have been easier to secure at an earlier moment in time.").

Third, the delay also supports the finding that Mr. Danzi entered his guilty plea voluntarily. *See Doe*, 537 F.3d at 213 ("Whereas a swift change of heart may indicate [a] plea made in haste or confusion, the fact that the defendant waited five months to file his motion strongly supports ... that his plea was entered

voluntarily.") (citations and quotation marks omitted, other alterations in original); *United States v. Khan*, 328 Fed. Appx. 704, 707 (2d Cir.2009) (summary order) (same). There are, of course, other reasons for believing that Mr. Danzi's plea was voluntary. The Court has already discussed Mr. Danzi's primary argument for why his plea was voluntary—the *Brady* violation—and will not do so again here except to say that it fails for the same reasons explained above. Any other potential basis for arguing that Mr. Danzi's plea was not voluntary is belied by the extensive, sworn plea allocution, also detailed above, in which Mr. Danzi stated that his plea was freely given; not the product of coercion; and that he had sufficient time to discuss it with his attorney (with whom he expressed satisfaction). *See* Tr. of Change of Plea H'ring [doc. # 252]; *see also Doe*, 537 F.3d at 211 ("[S]tatements at a plea allocution carry a strong presumption of veracity."); *Maher*, 108 F.3d at 1521 ("[T]he district court is entitled to accept a defendant's statements under oath at a plea allocution as true."). Insofar as Mr. Danzi has said that the circumstances surrounding his decision to plead guilty were extremely stressful—which, to be clear, the Court does not doubt for a moment—this is a product of the criminal justice system itself, and absent circumstances not present here, the stressful circumstances of plea allocutions does not render Mr. Danzi's decision to plead guilty any less voluntary, at least in the legal sense. *See Doe*, 537 F.3d at 211 (" 'Voluntary' for purposes of entering a lawful plea to a criminal charge has never meant the absence of benefits influencing the defendant to plead. Indeed, the Supreme Court has instructed that, with regard to voluntariness, a guilty plea must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or

unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).") (citations and quotation marks omitted).

Finally, Mr. Danzi does not claim that he is actually innocent of the charges to which he pleaded guilty. In fact, during his plea colloquy, he stated, under oath, that he was guilty of the charges. And he has never repudiated that statement.

In sum, Brian Danzi has not demonstrated a "fair and just reason" for withdrawing his guilty plea under Rule 11(d)(2)(B) of the *Federal Rules of Criminal Procedure*. *See Doe*, 537 F.3d at 210. Therefore, his Motion to Withdraw Guilty Plea [doc. # 245] on that ground is denied.

## IV.

For the foregoing reasons, Brian Danzi's Motion to Withdraw Guilty Plea [doc. # 245] is DENIED.

IT IS SO ORDERED.